THOMAS G. CHAMBERLAIN et al., as Successor Trustees under the Will of SAMUEL L. CLEMENS, Deceased, et al., Respondents, v. LEW D. FELDMAN, Appellant, et al., Defendants.

Argued November 16, 1949; decided December 29, 1949.

*Allan Hyman* for appellant. The Appellate Division erroneously held that defendant had failed to sustain the burden of proof when actually plaintiffs had failed to sustain their burden of proof. (*Murray Lighterage & Transp. Co.* v. *Warren,* 171 App. Div. 696; *Hoffman House* v. *Barkley,* 111 App. Div. 564; *Pushman* v. *New York Graphic Soc.,* 287 N. Y. 302; *Turner* v. *Robertson,* 10 Irish Ch. Rep. 121; *Yardley* v. *Houghton Mifflin Co.,* 108 F. 2d 28, 309 U. S. 686.)

*Alexander S. Andrews, Edward J. Willi, Cecil L. Head* and *Maurice R. Cheyette* for respondents. I. The literary property in a writing is a separate and distinct property from the physical writing itself and this literary property remains in the author or his estate until transferred expressly or by manifest intent. (*Duke of Queensberry* v. *Shebbeare,* 2 Eden 329; *Pope* v. *Curl,* 2 Atk. 342; *Thompson* v. *Stanhope,* 2 Ambler 737; *Cadell* v. *Stewart,* 1 Bell Comm. 116, note; *Stephens* v. *Cady,* 14 How. [U. S.] 528; *Pushman* v. *New York Graphic Soc.,* 287 N. Y. 302.) II. Respondents' only burden of proof was completely borne and the burden was on appellant respecting his pleaded affirmative defense. (*Stephens* v. *Howells Sales Co.,* 16 F. 2d 805; *Philip* v. *Pennell* [1907], 2 Ch. 577; *Rawley* v. *Brown,* 71 N. Y. 85; *O'Neill* v. *General Film Co.,* 171 App. Div. 854; *Thayer* v. *Jallade,* 263 App. Div. 909; *Mindlin* v. *Dorfman,* 197 App. Div. 770; *Lowery* v. *Erskine,* 113 N. Y. 52; *Gillette* v. *Stoll Film Co.,* 120 Misc. 850; *Houghton Mifflin Co.* v. *Stackpole Sons,* 104 F. 2d 306; *Gerlach-Barklow Co.* v. *Morris & Bendien, Inc.,* 23 F. 2d

159.) III. Regardless of the burden of proof respondents affirmatively proved by uncontradicted evidence the utter improbability, indeed impossibility, that Mark Twain ever transferred publication rights in the manuscript after the inchoate affair with the *Atlantic Monthly*. (*Thayer* v. *Jallade,* 263 App. Div. 909; *Mindlin* v. *Dorfman,* 197 App. Div. 770; *Lowery* v. *Erskine,* 113 N. Y. 52.)

DESMOND, J. In 1876, Samuel L. Clemens, under his pen name of "Mark Twain", wrote a story entitled "A Murder, A Mystery and A Marriage", and in the same year offered the manuscript to William Dean Howells, editor of the *Atlantic Monthly,* for publication. There followed, during the same year, some correspondence between Twain and Howells, in which was discussed an unusual project which the author had in mind: he proposed that a number of other famous writers of the period (such as Bret Harte and Howells himself) be enlisted, each to write his own final chapter for the work, so that for the mystery set up in the first few chapters, each author would compose a solution, in addition to, or in competition with Twain's own denouement. In other words, as planned by Twain, there was to be a common plot for the story, with a number of different endings. For one reason or another, including the reluctance of famous writers to dance to a rival's music, Twain's pet scheme came to nothing. Twenty years later, an entry in Twain's diary dated March 18, 1897, records a rather vague hope of the author to "make a skeleton novelette plot and write all the stories myself" or use it as the basis for a prize story competition. Whether that entry referred to "A Murder, A Mystery and A Marriage" we do not know, but there is undisputed proof, credited by both courts below, that when Mark Twain died in 1910, the manuscript of "A Murder, A Mystery and a Marriage" was not found among his effects and had never been published anywhere, by anyone.

In 1945, defendant Feldman bought the original manuscript (holographic and signed) at an auction sale, in New York City, of the rare books and manuscripts that had been in the possession, during his life, of Dr. James Brentano Clemens (no kin of Mark Twain) and had passed by inheritance to Dr. Clemens' wife. How Dr. Clemens came to have the writing is unknown.

Mr. Feldman sought permission from plaintiffs, who are the present owners of all literary property formerly belonging to Mark Twain and not otherwise disposed of, to publish the work, but permission was refused. Defendant Feldman went ahead with the publication, however, and this suit was brought to enjoin him from reproducing or publishing the story, in any way. The complaint prays also for a direction to defendant to cancel a purported statutory copyright entered by defendant in the office of the Federal Register of Copyrights. It is not claimed that this statutory copyrighting, or attempt at such, was with the permission of plaintiffs, or any of them.

The trial court was of the opinion that " it must be presumed that its transfer [by Twain] was legal and that all rights in connection with it have passed to defendant, the ultimate pur-. chaser." The trial court therefore made a finding that Twain during his lifetime had transferred and conveyed the manuscript, and that such transfer and conveyance " was made without any reservation of his [Twain's] right to publish or reproduce the same." Under the rule of *Pushman* v. *New York Graphic Soc.* (287 N. Y. 302) and many older authorities, such an unrestricted transfer of this fictional manuscript (if it ever occurred) would probably have carried with it, and amounted to, a transfer of the common-law copyright and right to reproduce. On the trial, therefore, the complaint was dismissed on the merits.

On appeal, however, the Appellate Division reversed the findings below, and made new fact findings of its own. It concluded that " it is impossible to spell out from the known conduct of the author that there was a voluntary transfer of the manuscript to anyone which carried with it the privilege of publication." (274 App. Div. 515, 518.) In other words, the Appellate Division, noting that there was no direct evidence of any unrestricted transfer during the author's lifetime, found no basis for presuming or inferring such a grant by Twain, much less for presuming or inferring that such a transfer, or a series of transfers, all unrestricted, had carried the paper into the ownership and possession of Dr. James Brentano Clemens. Putting its views into a formal decision, the Appellate Division made new findings of fact to the effect that

during Twain's lifetime the manuscript had been rejected, for publication, by the *Atlantic Monthly* and William Dean Howells, and that Twain " finally regarded the manuscript as unsuitable and never intended it for publication." The finding just quoted, with others made by the Appellate Division, amounts to a determination of fact that neither the author nor his successors in interest ever granted to anyone the literary property in " A Murder, A Mystery and A Marriage ". The Appellate Division therefore directed judgment for plaintiffs, which judgment perpetually restrained defendant from publishing, producing or reproducing the story.

Under familiar rules (Civ. Prac. Act, § 605; *Pocket Books, Inc.*, v. *Meyers*, 292 N. Y. 58) we are, because of the reversal and the making of new findings by the Appellate Division, required to determine whether the weight of evidence lies with one or the other set of findings. From the proofs briefly referred to herein, and other convincing items in the record, we conclude that the great weight of evidence is that Mark Twain never parted with the publication rights to this novelette or plot, and that neither defendant nor anyone else ever acquired them. (In coming to that conclusion we do not rely, since the Appellate Division made no finding in this connection, on any of the indications that this material was only a plot or outline and never really finished.)

With the facts in that posture, little problem remains. The common-law copyright, or right of first publication, is a right different from that of ownership of the physical paper; the first of those rights does not necessarily pass with the second; and " the separate common law copyright or control of the right to reproduce belongs to the artist or author until disposed of by him and will be protected by the courts " (see *Pushman* v. *New York Graphic Soc.*, 287 N. Y. 302, 307, *supra*, and cases cited thereat; see similarly, as to statutory copyright, U. S. Code, tit. 17, § 27). Since it has here been found to be the fact that, however the manuscript left the possession of the author, he never intended that it be published, it follows that defendant could not have bought the publication rights.

A recent commentary on this case (62 Harv. L. Rev. 1406–1407) suggests that it may be contrary to sound policy to

keep meritorious literary achievement out of the public domain for so long a time as is here involved. Without expressing any views of our own as to the advisability of permitting literary flowers so to blush unseen, we state our agreement with the last sentence of that Law Review article, in which it is pointed out that any such change of public policy must be the doing of the Legislature.

The judgment should be affirmed, with costs.

LOUGHRAN, Ch. J., LEWIS, CONWAY, DYE, FULD and BROMLEY, JJ., concur.

Judgment affirmed.