[830 NE2d 250, 797 NYS2d 352]

CAPITOL RECORDS, INC., Appellant, v NAXOS OF AMERICA, INC., Respondent.

Argued February 8, 2005; decided April 5, 2005

### POINTS OF COUNSEL

*Mayer, Brown, Rowe & Maw LLP,* New York City (*Philip Allen Lacovara* and *Todd Lundell* of counsel), and *Kaplan & Leven-*

son LLP (Paul R. Levenson of counsel) for appellant. I. New York common law prohibits misappropriation of pre-1972 sound recordings until 2067, despite the expiration of a foreign statutory copyright. (*Firma Melodiya v ZYX Music GmbH*, 882 F Supp 1306; *Capitol Records v Greatest Records*, 43 Misc 2d 878; *Metropolitan Opera Assn. v Wagner-Nichols Recorder Corp.*, 199 Misc 786, 279 App Div 632; *Apple Corps v Adirondack Group*, 124 Misc 2d 351; *Radio Corp. of Am. v Premier Albums*, 19 AD2d 62; *A & M Records, Inc. v M.V.C. Distrib. Corp.*, 574 F2d 312; *G.M.L., Inc. v Mayhew*, 188 F Supp 2d 891; *CBS, Inc. v Garrod*, 622 F Supp 532, 803 F2d 1183; *People v Winley*, 105 Misc 2d 474; *Goldstein v California*, 412 US 546.) II. New York common law requires showing only ownership of a valid right and unauthorized copying but does not require a separate showing of bad faith. (*Capitol Records v Greatest Records*, 43 Misc 2d 878; *Roy Export Co. Establishment of Vaduz, Liechtenstein v Columbia Broadcasting Sys., Inc.*, 672 F2d 1095; *Green v Lindsey*, 885 F Supp 469; *Capitol Records, Inc. v Wings Digital Corp.*, 218 F Supp 2d 280; *G. Ricordi & Co. v Haendler*, 194 F2d 914; *Mastro Plastics Corp. v Emenee Indus.*, 16 AD2d 420, 12 NY2d 826; *Saratoga Vichy Spring Co., Inc. v Lehman*, 625 F2d 1037; *Eagle Comtronics v Pico Prods.*, 256 AD2d 1202; *Computer Assoc. Intl., Inc. v Computer Automation, Inc.*, 678 F Supp 424.) III. Naxos of America, Inc.'s conduct constitutes misappropriation and infringement of Capitol Records, Inc.'s common-law copyright, despite alleged enhancement of sound quality. (*Durham Indus., Inc. v Tomy Corp.*, 630 F2d 905; *Metropolitan Opera Assn. v Wagner-Nichols Recorder Corp.*, 199 Misc 786; *Capitol Records v Greatest Records*, 43 Misc 2d 878; *Firma Melodiya v ZYX Music GmbH*, 882 F Supp 1306; *Apple Corps v Adirondack Group*, 124 Misc 2d 351; *UMG Recordings, Inc. v MP3.Com, Inc.*, 92 F Supp 2d 349; *Harvey Mach. Co. v Harvey Aluminum Corp.*, 9 Misc 2d 1078; *Eldred v Ashcroft*, 537 US 186; *Agee v Paramount Communications, Inc.*, 853 F Supp 778, 59 F3d 317.)

Schiff Hardin, LLP, New York City (*Maxim H. Waldbaum, Lori D. Greendorfer* and *John Becker* of counsel), for respondent. Naxos of America, Inc. is entitled to defeat Capitol Records, Inc.'s claim for infringement of common-law copyrights in the source recordings. (*Capitol Records v Mercury Records Corp.*, 221 F2d 657; *Agee v Paramount Communications, Inc.*, 853 F Supp 778, 59 F3d 317; *Hasbro Bradley, Inc. v Sparkle Toys, Inc.*, 780 F2d 189; *Procter & Gamble Co. v Colgate-Palmolive Co.*, 199 F3d 74; *Saratoga Vichy Spring Co., Inc. v Lehman*, 625 F2d

1037; *Computer Assoc. Intl., Inc. v Computer Automation, Inc.,* 678 F Supp 424; *Eagle Comtronics v Pico Prods.,* 256 AD2d 1202; *Metropolitan Opera Assn. v Wagner-Nichols Recorder Corp.,* 199 Misc 786, 279 App Div 632; *Fame Publ. Co., Inc. v Alabama Custom Tape, Inc.,* 507 F2d 667; *Green v Lindsey,* 885 F Supp 469, 9 F3d 1537.)

*Loeb & Loeb LLP,* New York City (*Barry I. Slotnick* and *Eleanor M. Lackman* of counsel), and *Stanley Pierre-Louis,* Washington, D.C., for Recording Industry Association of America, amicus curiae. I. New York common-law copyright remains in effect despite expiration of foreign statutory copyright. (*Fonotipia Ltd. v Bradley,* 171 F 951; *Apple Corps v Adirondack Group,* 124 Misc 2d 351; *Radio Corp. of Am. v Premier Albums,* 19 AD2d 62; *Metropolitan Opera Assn. v Wagner-Nichols Recorder Corp.,* 199 Misc 786, 279 App Div 632; *Dowling v United States,* 473 US 207; *Firma Melodiya v ZYX Music GmbH,* 882 F Supp 1306; *Capitol Records v Greatest Records,* 43 Misc 2d 878; *Goldstein v California,* 412 US 546; *Capitol Records v Mercury Records Corp.,* 221 F2d 657; *Ferris v Frohman,* 223 US 424.) II. A cause of action for infringement of a common-law copyright does not require a showing of bad faith. (*International News Serv. v Associated Press,* 248 US 215; *Apple Corps v Adirondack Group,* 124 Misc 2d 351; *Metropolitan Opera Assn. v Wagner-Nichols Recorder Corp.,* 199 Misc 786, 279 App Div 632; *Fonotipia Ltd. v Bradley,* 171 F 951; *Capitol Records v Greatest Records,* 43 Misc 2d 878; *Radio Corp. of Am. v Premier Albums,* 19 AD2d 62; *Roy Export Co. Establishment of Vaduz, Liechtenstein v Columbia Broadcasting Sys., Inc.,* 672 F2d 1095, 459 US 826; *Electrolux Corp. v Val-Worth, Inc.,* 6 NY2d 556; *Saratoga Vichy Spring Co., Inc. v Lehman,* 625 F2d 1037; *Feist Publs., Inc. v Rural Tel. Serv. Co., Inc.,* 499 US 340.) III. A "new product" founded on a misappropriated work is an infringement of the common-law copyright in the original work. (*Stewart v Abend,* 495 US 207; *Grand Upright Music Ltd. v Warner Bros. Records, Inc.,* 780 F Supp 182; *Jarvis v A & M Records,* 827 F Supp 282; *Metropolitan Opera Assn. v Wagner-Nichols Recorder Corp.,* 199 Misc 786; *Apple Corps v Adirondack Group,* 124 Misc 2d 351; *Harvey Mach. Co. v Harvey Aluminum Corp.,* 9 Misc 2d 1078; *Capitol Records v Greatest Records,* 43 Misc 2d 878; *A&M Records, Inc. v Napster, Inc.,* 239 F3d 1004; *Micro Star v Formgen Inc.,* 154 F3d 1107; *Castle Rock Entertainment, Inc. v Carol Publ. Group, Inc.,* 150 F3d 132.)

544

GRAFFEO, J.

Sound recordings produced after February 15, 1972 can be protected from infringement under federal copyright law but Congress did not extend statutory protection to recordings created before that date. In a certified question, the United States Court of Appeals for the Second Circuit asks us whether there is common-law copyright protection in New York for sound recordings made prior to 1972.

This case involves a dispute between two music recording companies. Capitol Records, Inc. owns the rights to several classical recordings made in the 1930s. Naxos of America, Inc. copied those recordings from the original shellac record format and, using technological advances, remastered the recordings for sale to the public as compact discs. Naxos did not request permission from Capitol to use the recordings. The issue here is whether Capitol may maintain a copyright infringement action against Naxos premised on the common law of New York. Because the answer to this question will have significant ramifications for the music recording industry, as well as these litigants, we were offered and accepted certification.

## I. Factual and Procedural Background

During the 1930s, the Gramophone Company Limited, currently known as EMI Records Limited—the parent company of Capitol—recorded classical musical performances of three world-renowned artists: Yehudi Menuhin's July 1932 performance of Edward Elgar's "Violin Concerto in B minor, Opus 61"; Pablo Casals' performances of J.S. Bach's cello suites, recorded between November 1936 and June 1939; and Edwin Fischer's performances of Bach's "The Well Tempered Clavier, Book I," recorded between April 1933 and August 1934, and of Bach's "The Well Tempered Clavier, Book II," recorded between February 1935 and June 1936. The artists' contracts specified that Gramophone would have absolute, worldwide rights to the performances, including the right to reproduce and sell copies of the performances to the public.

Gramophone recorded all of the performances in England. At that time, the United Kingdom provided statutory copyright protection to sound recordings for 50 years (*see* UK Copyright Act of 1911, 1 & 2 Geo 5, ch 46, § 19). Thus, all of the Gramophone recordings at issue had entered the public domain in the United Kingdom by 1990.

In 1996, subsidiaries of EMI entered into a series of agreements whereby Capitol was granted an exclusive license to exploit the Gramophone recordings in the United States. Using modern electronic methods, Capitol remastered the original recordings to improve their audio quality and transferred them to digital format for sale to the public.

Naxos also wished to preserve these important historical recordings. It located copies of the original 1930s shellac recordings and undertook its own multistep restoration process in the United Kingdom. The remastered compact disc versions produced by Naxos were distributed for sale in the United States beginning in 1999, competing with the compact disc products marketed by Capitol. Naxos never obtained a license from Capitol and rebuffed Capitol's demand to cease and desist the sale of the Naxos compact discs.

Capitol commenced an action against Naxos in the United States District Court for the Southern District of New York in 2002. The complaint set forth claims of common-law copyright infringement, unfair competition, misappropriation and unjust enrichment, all of which were premised on the law of the State of New York, the situs of the alleged infringement. Naxos moved to dismiss for failure to state a claim, arguing that the recordings had entered the public domain in the United Kingdom and, hence, the United States as well. Capitol moved for, among other relief, partial summary judgment on liability.

The District Court granted summary judgment to Naxos. The court characterized Capitol's cause of action as a "hybrid copyright, unfair competition" claim and concluded that Capitol did not have intellectual property rights in the original recordings because its copyrights had expired in the United Kingdom. (262 F Supp 2d 204, 210 [2003].) With respect to the unfair competition cause of action, the District Court opined that the Naxos recordings were not a "duplicate" or "imitation" of the original recordings but "an entirely new and commercially viable product" because the original shellac records were obsolete and Naxos had removed "numerous sound imperfections" from the records. (Id. at 213, 214.) Finding that public policy favored the preservation and redissemination of classical performances, the court held that Capitol failed to show that Naxos had engaged in the type of bad faith required to sustain an unfair competi-

tion cause of action. In a second written decision, the court adhered to its ruling.[1]

On appeal, the Second Circuit determined that this case raises several unsettled issues of New York law. After noting that, under federal law, "it is entirely up to New York to determine the scope of its common law copyright with respect to pre-1972 sound recordings," the Second Circuit certified the following question to this Court: "In view of the District Court's assessment of the undisputed facts, but without regard to the issue of abandonment, is Naxos entitled to defeat Capitol's claim for infringement of common law copyrights in the original recordings?" (372 F3d 471, 478, 484 [2004].) We are also asked to answer three questions:

> "(1) 'Does the expiration of the term of a copyright in the country of origin terminate a common law copyright in New York?' (2) 'Does a cause of action for common law copyright infringement include some or all of the elements of unfair competition?' (3) 'Is a claim of common law copyright infringement defeated by a defendant's showing that the plaintiff's work has slight if any current market and that the defendant's work, although using components of the plaintiff's work, is fairly to be regarded as a "new product"?' " (*Id.* at 484-485.)

## II. English Copyright Law

Because of the close connection between the evolution of copyright protection in England and the American adaptation of copyrights, it is helpful to examine the historical roots of property rights in tangible intellectual products (*see generally Eldred v Ashcroft*, 537 US 186, 200 [2003] [when examining copyright law, " 'a page of history is worth a volume of logic' "], quoting *New York Trust Co. v Eisner*, 256 US 345, 349 [1921] [Holmes, J.]).

With the introduction of the printing press in England in the 15th century, a commercial interest in written works was born. It was, however, not authors but printers and publishers who initially sought to control the right to publish literary works (*see* Patterson, Copyright in Historical Perspective, at 6, 21). The concept of an exclusive right to reproduce works sprang

---

**1.** The District Court also addressed issues of waiver and abandonment, which are not relevant to the certified question posed to us.

from the commercial objectives of stationers or printers who wished to create a monopoly over the printing trade (*see id.* at 28-64). At the same time, the Crown had an interest in maintaining censorship authority over the press. Thus, the granting of an exclusive right to reproduce printed materials served the government's desire to control the flow and content of information, and supported the economic viability of the printers' trade guild (*see id.* at 223). This symbiotic relationship gave rise to early English copyright laws, such as those issued by the Star Chamber in its Decrees of 1586 and 1637, which reflected trade and guild regulations that assisted in preserving government censorship (*see id.* at 6, 9-11, 121, 125).

After the abolition of the Star Chamber in 1641 and the civil war between the Crown and Parliament, English law began to recognize an author's natural property right to control the dissemination of a literary creation (*see id.* at 160-162; *see also* 2 Blackstone, Commentaries on the Laws of England, at 405-406 [1769]; *Millar v Taylor*, 98 Eng Rep 201, 257, 4 Burr 2303, 2406-2407 [KB 1769] [Mansfield, L.C.J.] [discussing the "uniform( )" decisions of the Chancery Court]; 98 Eng Rep at 212, 4 Burr at 2323 [Willes, J.] [same]). Parliament's passage of the Statute of Anne in 1709 (8 Anne ch 19) signaled an attempt to end government censorship and trade guild monopoly. It broadened the concept of copyrights to include the ability of an author to decide whether a literary work would be published and disseminated to the public (referred to as the "right of first publication") and, if distributed, how the work would be reproduced in the future. The Statute of Anne vested an author or publisher of a literary work with statutory copyright protection for specified time periods—new works received 14 years of copyright protection (with the possibility of a 14-year renewal) and previously published works were entitled to 21 years of protection (*see* Patterson, Copyright in Historical Perspective, at 143-150).

In the latter half of the 18th century, a recognition emerged that the creation of a literary work should vest rights in its author similar to the ownership rights in perpetuity associated with other forms of tangible property. The common law embraced this concept of ownership for literary works (*see* 2 Blackstone, Commentaries on the Law of England, at 405-406). This caused a "great question of literary property" to arise (*Proceedings in the Lords on the Question of Literary Property*, 17 Parliamentary History of England, at 953, 953-954 n [HL

1774]): did the Statute of Anne supplant the common law or did it provide additional rights and remedies that coexisted with the common law?

The first definitive ruling on this question appears in *Millar v Taylor* (98 Eng Rep 201, 4 Burr 2303 [KB 1769]). Millar, a bookseller, had purchased the rights to a certain book from its author. The dispute involved the unauthorized reproduction of the book by another publisher after copyright protection extended by the Statute of Anne had expired. The primary issues were whether common-law rights continued to exist in perpetuity after the first publication of a literary work and, if so, whether the Statute of Anne had abrogated the perpetual common-law copyright. In a 3-1 decision in favor of the bookseller, the court of King's Bench concluded that the common law furnished perpetual copyright protection that did not terminate upon the first publication of a literary work. More importantly, the Statute of Anne was viewed as not extinguishing common-law protections (*see* 98 Eng Rep at 252-253, 4 Burr at 2398-2399 [Mansfield, L.C.J.]; *see also* Patterson, Copyright in Historical Perspective, at 168-172).

Several years later, however, the House of Lords reached a different result in the seminal case of *Donaldson v Beckett* (4 Burr 2408; 17 Parliamentary History of England, at 953 [HL 1774]). Relying on the *Millar* precedent, the Chancery Court had granted an injunction against the sale of an unauthorized reproduction of a literary work even though the work was not entitled to protection under the Statute of Anne. Given the importance of the issues presented, the House of Lords sought advisory opinions from 12 judges on five questions.[2] The judges were asked to rule on whether the common law recognized the right of first publication; and if perpetual protection existed in common law for literary works, whether the Statute of Anne operated to curtail that protection.[3]

---

    **2.** One of the judges was Lord Chief Justice Mansfield, who, as a member of the House of Lords, declined to provide an opinion because of his participation in *Millar v Taylor* (4 Burr at 2417).

    **3.** The texts of the inquiries by the House of Lords were as follows:
        1. "Whether, at common law, an author of any book or literary composition, had the sole right of first printing and publishing the same for sale, and might bring an action against any person who printed, published, and sold the same without his consent?"
        2. "If the author had such right originally, did the law take it away upon his printing and publishing such book or literary com-

The judges determined that the common law recognized a right of first publication (*see Donaldson v Beckett*, 4 Burr at 2417 [vote was 8-3]; *cf.* Patterson, Copyright in Historical Perspective, at 175 [vote was 10-1]) and that the common-law copyright protection extended beyond first publication into perpetuity (*see Donaldson v Beckett*, 4 Burr at 2417 [vote was 7-4]). By a 6-5 margin, the judges disagreed with the *Millar* court and concluded that the Statute of Anne was intended to abrogate the common law with respect to the duration of copyright protection (*see id.*). Applying the restrictions of the Statute of Anne, the House of Lords reversed and rescinded the injunction (*see id.*; *Proceedings in the Lords on the Question of Literary Property*, 17 Parliamentary History of England, at 958 n).[4] The

position, and might any person afterward reprint and sell, for his own benefit, such book or literary composition, against the will of the author?"

3. "If such an action would have lain at common law, is it taken away by the statute of 8th Anne: and is an author, by the said statute, precluded from every remedy except on the foundation of the said statute, and on the terms and conditions prescribed thereby?"

4. "Whether the author of any literary composition, and his assigns, had the sole right of printing and publishing the same, in perpetuity, by the common law?"

5. "Whether this right is in any way impeached, restrained, or taken away, by the statute 8th Anne?" (*Proceedings in the Lords on the Question of Literary Property*, 17 Parliamentary History of England, at 970-971.)

4. The precise ruling by the House of Lords is the subject of scholarly debate. Professor Nimmer, among other commentators, takes the position that the House of Lords voted to overrule *Millar* only with regard to the abrogation question (*see* 1 Nimmer on Copyright § 4.02 [B], at 4-14, and n 12; *see also* Bowker, Copyright, Its History and Its Law, at 7 [1912]; Patterson, Copyright in Historical Perspective, at 174 ["The actual holding of the *Donaldson* case is that the author's common-law right to the sole printing, publishing, and vending of his works, a right which he could assign in perpetuity, is taken away and supplanted by the Statute of Anne"]; Burger, *The Berne Convention: Its History and Its Key Role in the Future*, 3 J Law & Tech 1, 6 n 25 [1988]; Cambridge Research Institute, Omnibus Copyright Revision, Comparative Analysis of the Issues, at 6 [1973]). It has been argued, however, that the House of Lords actually held that the common law never provided any copyright protection and that the rights of authors and publishers were solely statutory in nature (*see* Abrams, *The Historic Foundation of American Copyright Law: Exploding the Myth of Common Law Copyright*, 29 Wayne L Rev 1119, 1164 [Spring 1983]; Deazley, *Re-Reading Donaldson [1774] in the Twenty-First Century and Why It Matters*, 25 [6] Eur Intell Prop Rev 270, 274 [2003]; Brown, Kaplan and Brown's Copyright, at 53, and n 32 [2d ed 1974]). The controversy stems from the lack of any contemporaneous report of the

supremacy of statutory time limitations for copyright protection was now firmly established in English law.

### III. Development of American Copyright Law

We enter the colonial era in America. In the midst of the Revolutionary War and transformation of the British colonies into independent states and commonwealths, it was generally presumed that colonial common law, derived from English law, should be applied as long as it was consistent with the acts of the colonial legislatures. Notably, preservation of existing common law was addressed in the first Constitution of the State of New York (*see* NY Const art XXXV [1777] [renumbered as article I, § 14 and amended by Constitutional Convention of 1938]). Our Founders were aware that there was common-law copyright protection in England, as evidenced in James Madison's writings, which observed that "[t]he copyright of authors has been solemnly adjudged, in Great Britain, to be a right of common law" (Madison, Federalist No. 43).

Similar to the British experience, the new states responded to the needs of authors and publishers by adopting statutory copyrights. Using the Statute of Anne as a model, Connecticut, followed by Massachusetts and Maryland, enacted statutes assuring copyright protection for between 14 and 28 years following first publication (*see* Library of Congress, Copyright Enactments, 1783-1900, at 9-14). Soon thereafter, the Colonial Congress (operating under the Articles of Confederation) recommended that each state pass legislation providing at least 14 years of copyright protection after first publication (*id.* at 9). Twelve of the 13 original states would eventually heed this call (*see id.* at 14-29; Nachbar, *Constructing Copyright's Mythology*, 6 Green Bag 2d 37, 38 [Autumn 2002]). When the New York Legislature acted, it contemplated the existence of common-law copyright protections separate from statutory rights: "nothing in this act, shall extend to effect prejudice, or confirm the rights, which any person may have, to the printing or publishing of any book or pamphlet, at common law, in cases not mentioned in this act" (L 1786, ch 54, § IV).

As the drafting of the national Constitution was underway, the Founders decided that federal copyright protection would be more effective and desirable than leaving the matter to the

---

opinions of the Lords, because at that time it was "contempt punishable by imprisonment to publish any statements made by a member of Parliament in the course of parliamentary business" (Abrams, *supra* at 1159).

discretion of the states (*see* Madison, Federalist No. 43; Patterson, Copyright in Historical Perspective, at 192-193). In fact, the need for "national protection for intellectual property seems to have been accepted at first and full impression by both the [Constitutional] Convention and the states adopting the Constitution" (Sutak, The Great Motion Picture Soundtrack Robbery, at xiii-xiv [1976]). This fundamental belief in the need for uniform copyright protection led to the constitutional provision vesting Congress with the "Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries" (US Const, art I, § 8 [8]). When the first Congress convened under the authority of the new Constitution, it enacted America's first federal copyright statute—the Copyright Act of 1790. The Act provided the author "of any map, chart, book or books," or the author's assignee, the exclusive "right and liberty of printing, reprinting, publishing and vending such map, chart, book or books" for up to 28 years (Act of May 31, 1790 § 1 [1st Congress, 2d Sess, ch 15], 1 US Stat 124, reprinted in Library of Congress, Copyright Enactments, 1783-1900, at 30-32).

The American counterpart to *Millar* and *Donaldson* reached the United States Supreme Court in the case of *Wheaton v Peters* (8 Pet [33 US] 591 [1834]). The plaintiff, who had been the third official reporter for the United States Supreme Court, invoked statutory and common-law copyright claims to prevent his successor from copying and republishing material contained in the volumes published by the first three official reporters (*see* Patterson, Copyright in Historical Perspective, at 203). The Supreme Court, with two Justices dissenting, remanded for factual determinations on the statutory copyright claim but held that Wheaton could not maintain a common-law copyright cause of action. The majority and dissenting opinions extensively debated the impact of *Millar* and *Donaldson* on colonial copyright law. The majority acknowledged that the common law insured copyright protection prior to publication but believed that in the absence of federal common law under our constitutional system, a party seeking common-law protection must look to the state where the controversy arose (*see Wheaton v Peters*, 8 Pet [33 US] at 658).

The lasting effect of the *Wheaton* decision was that it "became accepted, and in most cases unquestioned, doctrine that . . . it was the act of publication which divested common law rights"

(1 Nimmer on Copyright § 4.02 [C], at 4-17).[5] New York courts also adhered to this view with regard to literary works, declaring the "settled" principle that "a statutory copyright operates to divest a party of the common-law right" (*Jewelers' Mercantile Agency v Jewelers' Weekly Publ. Co.*, 155 NY 241, 247 [1898]; *see e.g. Palmer v De Witt*, 47 NY 532, 536 [1872]).

With the dawn of the 20th century, courts throughout the country were confronted with issues regarding the application of copyright statutes, which were created with sole reference to the written word, to new forms of communication. One of the first such challenges involved music. In *White-Smith Music Publ. Co. v Apollo Co.* (209 US 1 [1908]), the United States Supreme Court was asked to determine whether the federal Copyright Act encompassed perforated rolls of music used in player pianos.[6] Although acknowledging that the federal statute had been amended as far back as 1831 to include "musical composition[s]," the Court believed that only written works that could be "see[n] and read" met the requirement for filing with the Library of Congress—a prerequisite to securing federal copyright protection (*id.* at 17). Because the music rolls were incapable of being read by a person, the Court concluded that federal statutory protection for "copies or publications of the copyrighted music" did not extend to music rolls (*id.* at 18).

Following the *White-Smith* decision, Congress passed the Copyright Act of 1909. Since the Supreme Court had declared that player piano rolls and, by implication, sound recordings could not be "published" (i.e., read by a person) under federal law, Congress did not include audio musical works within the scope of the statute (*see* Keller and Cunard, Copyright Law: A Practitioner's Guide § 1:3:1, at 1-18 [Aug. 2004]). Despite the fact that sound recordings could not be "published" under federal law, they were eligible for state common-law protection (*see Wheaton v Peters*, 8 Pet [33 US] at 687 [Thompson, J., dissenting]). To insure that the 1909 Act would not be interpreted to deny any existing common-law protection, Congress explicitly stated that the Act "shall [not] be construed to annul or limit

---

**5.** The majority opinion in *Wheaton* has been criticized for its failure to rely on the rationale of *Donaldson* (that common-law rights cease upon publication because divestment is required by statute) and the majority's "unpersuasive analysis of Pennsylvania common law" (1 Nimmer on Copyright § 4.03, at 4-18).

**6.** At this time, Congress was in the process of revising the copyright statutes but decided to wait for the Supreme Court's decision.

the right of the author or proprietor of an unpublished work, at common law or in equity, to prevent the copying, publication, or use of such unpublished work without his consent, and to obtain damages therefor" (17 USC § 2, added by 35 US Stat 1076 [1909]). Congress therefore confirmed that, although sound recordings were not protected under federal law, there was nothing to prevent the states from guaranteeing copyright protection under common law.

State courts then had to deal with the operation of this dual system of copyright protection. In *Waring v WDAS Broadcasting Sta.* (327 Pa 433, 194 A 631 [1937]), the plaintiff, a conductor and owner of an orchestra, had contracted with a phonograph company to produce recordings of the orchestra's performances to be sold to phonograph dealers and the public. To avoid interfering with a different contract the orchestra had for weekly radio broadcasts of live performances, the record labels contained a printed warning that they were "[n]ot licensed for radio broadcast." (327 Pa at 436, 194 A at 633.) The plaintiff sued to prevent the owner of a radio station from broadcasting the recorded performances over the airwaves.

The Supreme Court of Pennsylvania found that the records were protected by state common law. Beginning with the premise that sound recordings were not copyrightable under federal law, the court explained:

> "[a]t common law, rights in a literary or artistic work were recognized on substantially the same basis as title to other property. Such rights antedated the original copyright act of 8 Anne c. 19, and, while it has been uniformly held that the rights given by the act supersede those of the common law so far as the act applies . . . the common-law rights in regard to any field of literary or artistic production which does not fall within the purview of the copyright statute are not affected thereby" (327 Pa at 439, 194 A at 634).

The court declared that a performer who transforms a musical composition into a sound product creates "something of novel intellectual or artistic value [and] has undoubtedly participated in the creation of a product in which he is entitled to a right of property" (327 Pa at 441, 194 A at 635). Even if the common law offered protection to sound recordings only to the point of first publication, the court held that the sale of records was not a publication of the work that operated to divest the orchestra

of its common-law property right because the phonograph records had been marked "[n]ot . . . for radio broadcast," which indicated that the manufacturer did not intend, by the sale alone, to make the records the " 'common property' " of the public (327 Pa at 443, 194 A at 636, quoting *American Tobacco Co. v Werckmeister*, 207 US 284, 300 [1907]).

A similar dispute arose in New York in *Metropolitan Opera Assn. v Wagner-Nichols Recorder Corp.* (199 Misc 786 [Sup Ct, NY County 1950], *affd* 279 App Div 632 [1st Dept 1951]). The plaintiff's operatic performances had been broadcast on radio and records of the performances were sold to the public. The defendant copied those performances and created its own records for sale. In granting an injunction preventing the sale of the defendant's records, the trial court observed that "[a]t common law the public performance of a play, exhibition of a picture or sale of a copy of the film for public presentation did not constitute an abandonment of nor deprive the owner of his common-law rights" (199 Misc at 798). Far from expressing an intent to commit intellectual property to the public domain, the court determined that an owner who grants exclusive rights to record a performance to a particular company "shows clearly no intent to abandon but, on the contrary, an attempt to retain effective control over the . . . recording of its performances" (*id.* at 799). Thus, the court characterized the public sale of a sound recording as a "limited publication" that did not divest a composer or artist of common-law copyright protection (*id.*).

A contrary view was initially expressed by the Second Circuit in *RCA Mfg. Co. v Whiteman* (114 F2d 86 [2d Cir 1940], *cert denied* 311 US 712 [1940]). The court concluded that the sale of a record to the public is a general publication that ends common-law copyright protection. But the Second Circuit reconsidered this rule after *Metropolitan Opera* and subsequently stated that *RCA Mfg.* was "not the law of the State of New York" (*Capitol Records v Mercury Records Corp.*, 221 F2d 657, 663 [2d Cir 1955]). Instead, the court announced that the appropriate governing principle was that "where the originator, or the assignee of the originator, of records of performances by musical artists puts those records on public sale, his act does not constitute a dedication of the right to copy and sell the records" (*id.*).[7] *Capitol Records v Mercury Records* was consistent with the

---

7. This rule was reaffirmed in *Rosette v Rainbo Record Mfg. Corp.* (546 F2d 461 [2d Cir 1976], *affg* 354 F Supp 1183 [SD NY 1973]).

long-standing practice of the federal Copyright Office and became the accepted view within the music recording industry (*see* 1 Nimmer on Copyright § 4.05 [B] [4], at 4-35; Bailey, *Phonorecords and Forfeiture of Common-Law Copyright in Music*, 71 Wash L Rev 151, 157 [Jan. 1996]; Kaplan, *Publication in Copyright Law: The Question of Phonograph Records*, 103 U Pa L Rev 469, 472 [Jan. 1955]).

The *Waring, Metropolitan Opera* and *Capitol Records* decisions may appear to conflict with the accepted principle that a public sale of a literary work is a "general publication" terminating a common-law copyright, and any copyright protection thereafter must be derived from statute. But the historical distinction in the treatment of literary and musical works by Congress accounts for the lack of federal statutory copyright protection for sound recordings. In the absence of protective legislation, Congress intended that the owner of rights to a sound recording should rely on the "broad and flexible" power of the common law to protect those property rights after public dissemination of the work. As *Metropolitan Opera* so aptly observed more than five decades ago, the common law "has allowed the courts to keep pace with constantly changing technological and economic aspects so as to reach just and realistic results" (199 Misc at 799).

In recent times, state legislatures have found common-law remedies inadequate to deter the widespread prevalence of "music piracy." By the 1970s, the technological ease of reproducing existing recordings for resale without securing authorization had motivated about one half of the state legislatures, including New York (*see* Penal Law former § 441-c [L 1966, ch 988]), to adopt criminal statutes prohibiting such piracy (*see* HR Rep No. 94-1476, 94th Cong, 2d Sess, at 133, reprinted in 1976 US Code Cong & Admin News, at 5659, 5749). Spurred by the action of the states, Congress finally responded in 1971 and amended the Copyright Act of 1909 to expressly include "[s]ound recordings" within the classes of artistic and intellectual works entitled to federal copyright protection (17 USC § 5 [n], added by Pub L 92-140, 85 US Stat 391 [Act of Oct. 15, 1971]). But the 1971 amendments were prospective only, so recordings created before February 15, 1972—the effective date of the amendment—were not protected by federal law (*see* Pub L 92-140 § 3 [1971]). During the drafting of the amendment, debate arose concerning the scope of protection to be afforded to pre-1972 sound recordings. Both the Senate and the House of

Representatives recognized that decisional law had allowed sound recordings to be "protected by State statute or common law" (*see* HR Rep No. 94-1476, 94th Cong, 2d Sess, at 133, reprinted in 1976 US Code Cong & Admin News, at 5659, 5749). The Senate was content to permit the states to provide perpetual protection to pre-1972 sound recordings, but the House objected (*see id.*). The two houses eventually reached a compromise, deciding that existing state common-law copyright protection for pre-1972 recordings would not be preempted by the new federal statute until February 15, 2047—75 years after the effective date of the 1971 amendment (*see* 17 USC § 301 [c] [1976]).[8]

The 1971 amendments raised new problems for the music recording industry. Because the status of pre-1972 sound recordings was a matter left to the states, there was uncertainty as to how claims of copyright infringement would be treated in different jurisdictions. The amendments also did not include a technical definition of the term "publication," which clouded the meaning of that term of art in the recording industry. Finally, there was concern that the amendments could be read as abrogating existing state statutes proscribing music piracy (*see* HR Rep No 94-1476, 94th Cong, 2d Sess, at 133, reprinted in 1976 US Code Cong & Admin News, at 5659, 5749).

Initial guidance came from the United States Supreme Court in *Goldstein v California* (412 US 546 [1973]). The defendant, convicted of criminal music piracy, challenged the constitutionality of a California penal statute on the grounds that it conflicted with the Copyright Clause, the Supremacy Clause and the federal Copyright Act by "establish[ing] a state copyright of unlimited duration" (*id.* at 551). Rejecting the defendant's claim, the Court noted that "[a]lthough the Copyright Clause . . . recognizes the potential benefits of a national system, it does not indicate that all writings are of national interest or that state legislation is, in all cases, unnecessary or precluded" (*id.* at 556-557). The Court further observed that, because the Constitution does not require Congress to "take affirmative action either to authorize protection of all categories of writings or to free them of all restraint," it was sensible that the states

---

8. The preemption date was later extended by 20 years, to February 15, 2067 (*see* Pub L 105-298, 112 US Stat 2827 [105th Congress, 2d Sess, Oct. 27, 1998] [termed the "Sonny Bono Copyright Term Extension Act"], amending 17 USC § 301 [c]).

did not relinquish all power to provide copyright protection (*id.* at 560).

The Supreme Court also acknowledged that the states were free to act with regard to sound recordings precisely because Congress had not, and in the absence of conflict between federal and state law, the Supremacy Clause was not a barrier to a state's provision of copyright protection to a work not covered under federal copyright law (*see id.* at 569-570). Nor did the Court find fault with the perpetual nature of California's copyright (*see id.* at 560-561). Rejecting the defendant's "publication" argument, the Court clarified that

> "[f]or purposes of federal law, 'publication' serves only as a term of the art which defines the legal relationships which Congress has adopted under the federal copyright statutes. As to categories of writings which Congress has not brought within the scope of the federal statute, the term has no application" (*id.* at 570 n 28).

The effect of *Goldstein* was more than an affirmation of the states' right to enact criminal laws prohibiting music piracy. Its rationale clearly deviated from the *Wheaton* view—that publication divests common-law rights even in the absence of statutory protection. Instead, the Court relied on the rule that state common-law copyright protection can continue beyond the technical definition of publication in the absence of contrary statutory authority (*see* 1 Nimmer on Copyright § 4.02 [C], at 4-17 n 23).

In the aftermath of *Goldstein*, Congress rectified some of the problems that erupted with the 1971 amendment of the Copyright Act. A major revision and restructuring of the Act occurred in 1976 and took effect in 1978. Included among the amendments was a statutory definition of "publication," now defined to include "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership" (17 USC § 101). This definition applied prospectively only, thereby continuing to exclude pre-1972 recordings from the scope of the statute. Congress again left to the states the decision how to handle the meaning and effect of "publication" for pre-1972 sound recordings.

The music industry's belief that state common law could provide copyright protection for pre-1972 recordings (until the date of federal preemption), without regard to the "publication"

or sale of recordings, was undermined by the Ninth Circuit in *La Cienega Music Co. v ZZ Top* (53 F3d 950 [9th Cir 1995], *cert denied* 516 US 927 [1995]). This controversy pitted the owner of certain John Lee Hooker recordings against the band ZZ Top, which allegedly performed a top-selling song that was similar to earlier performances by Hooker. ZZ Top defended on the ground that any common-law protection was extinguished when the Hooker recordings were "published," i.e., released for sale to the public. This contention challenged the Second Circuit holdings in *Capitol Records* (221 F2d 657 [1955]) and *Rosette* (546 F2d 461 [1976])—the only other United States Court of Appeals to have addressed the issue. The defendants in *La Cienega* were successful in convincing the Ninth Circuit not to adopt the rationale of the Second Circuit, and the court therefore held that public sale of a pre-1972 sound recording is a publication that divests the owner of common-law copyright protection.

*La Cienega* was criticized in Congress as exposing pre-1972 sound recordings to unauthorized uses and as "overturn[ing] nearly 90 years of [precedential] decisions" (143 Cong Rec H9882-01 [statement of Rep. Coble]). It was estimated that the ruling, if allowed to stand, would cause musicians, composers and publishers to lose over a billion dollars in annual revenue (*see id.* [statement of Rep. Delahunt]). Congress reacted to *La Cienega* by amending section 303 of the federal Copyright Act to clarify that "[t]he distribution before January 1, 1978, of a phonorecord shall not for any purpose constitute a publication of the musical work embodied therein" (17 USC § 303 [b]). After the passage of this amendment, the Ninth Circuit acknowledged that the intent of Congress was to " 'restore national uniformity on this important issue by confirming the wisdom of the custom and usage of the affected industries and of the Copyright Office for nearly 100 years' " (*ABKCO Music, Inc. v La-Vere*, 217 F3d 684, 690 [2000] [quoting 143 Cong Rec S11301 (statement of Sen. Hatch)], *cert denied* 531 US 1051 [2000]). Congress had confirmed that sound recordings created before 1972 could be eligible for common-law copyright protection until federal preemption of state law in 2067.

IV. The Scope of Common-Law Copyright Protection in New York

The first New York State Constitution in 1777 permitted the continuation of colonial common law, derived from English common law. One such principle was that the creator of a literary

work was entitled to perpetual common-law copyright protection in the absence of abrogation by statute (*see* Madison, Federalist No. 43; *see also* Whicher, *The Ghost of Donaldson v. Beckett: An Inquiry Into the Constitutional Distribution of Powers Over the Law of Literary Property in the United States*, 9 Bull Copyright Socy 102, 131-143 [1962]; Taubman, Copyright and Antitrust, at 9, 14 [1960]). The State Legislature acted to supplant common-law copyright protection when it passed a statute in 1786 "to promote literature" (L 1786, ch 54). The statute restricted the copyright protection an author of a literary work could receive after first publication for up to 28 years (*see id.*). This statute was superseded by Congress in 1790 when the first national copyright act was enacted (*see* Act of May 31, 1790, reprinted in Library of Congress, Copyright Enactments, 1783-1900, at 30-32). Consistent with the statutory abrogation rule, this Court established that New York common law would provide copyright protection to a literary work up to the point that federal law governed (*see e.g. Jewelers' Mercantile Agency v Jewelers' Weekly Publ. Co.*, 155 NY at 247; *see also Palmer v De Witt*, 47 NY at 536; *Estate of Hemingway v Random House*, 23 NY2d 341, 346 [1968]).

As earlier discussed, federal copyright statutes in the early 20th century encompassed only written musical compositions, not sound recordings (*see White-Smith Music Publ. Co. v Apollo Co.*, 209 US at 18). Because the federal Copyright Act did not protect musical recordings, state common law could supply perpetual copyright protection to recordings without regard to the limitations of "publication" under the federal act (*see Goldstein v California*, 412 US at 560-561, 570). It is clear that both the judiciary and the State Legislature intended to fill this void by protecting the owners of sound recordings in the absence of congressional action (*see Rosette v Rainbo Record Mfg. Corp.*, 546 F2d 461 [1976]; *Capitol Records v Mercury Records Corp.*, 221 F2d 657 [1955]; *Metropolitan Opera Assn. v Wagner-Nichols Recorder Corp.*, 199 Misc 786 [1950]; *Firma Melodiya v ZYX Music GmbH*, 882 F Supp 1306, 1316 n 14 [SD NY 1995]; *see also* Penal Law art 275; Arts and Cultural Affairs Law § 31.01; General Business Law former § 561 [L 1967, ch 680, § 59]; Penal Law former § 441-c [L 1966, ch 988]).

With the 1971, 1976 and subsequent congressional amendments to the federal Copyright Act, New York common-law protection of sound recordings has been abrogated, but only in two respects. First, the common law does not apply to any sound

recording fixed, within the meaning of the federal act, after February 15, 1972, because recordings made after that date are eligible for federal statutory copyright protection. Second, state common-law copyright protection is no longer perpetual for sound recordings not covered by the federal act (those fixed before February 15, 1972), because the federal act mandates that any state common-law rights will cease on February 15, 2067. The musical recordings at issue in this case, created before February 15, 1972, are therefore entitled to copyright protection under New York common law until the effective date of federal preemption—February 15, 2067.

Even assuming, however, that common-law copyright protection ceases upon "first publication" without regard to the existence of an applicable statute covering the type of literary or artistic work at issue, our common law would continue to protect sound recordings made before 1972.

The evolution of copyright law reveals that the term "publication" is a term of art that has distinct meanings in different contexts. With regard to literary works, it has long been the rule that common-law protection ends when a writing is distributed to the public (*see e.g. Palmer v De Witt*, 47 NY at 536; *Chamberlain v Feldman*, 300 NY 135, 139 [1949]; *Estate of Hemingway v Random House*, 23 NY2d at 345-346) because it is at that point that federal statutory copyright protection controls (*see Jewelers' Mercantile Agency v Jewelers' Weekly Publ. Co.*, 155 NY at 247). In contrast, in the realm of sound recordings, it has been the law in this state for over 50 years that, in the absence of federal statutory protection, the public sale of a sound recording otherwise unprotected by statutory copyright does not constitute a publication sufficient to divest the owner of common-law copyright protection (*see Rosette v Rainbo Record Mfg. Corp.*, 546 F2d 461 [2d Cir 1976], *affg* 354 F Supp 1183 [SD NY 1973]; *Capitol Records v Mercury Records Corp.*, 221 F2d at 663; *Radio Corp. of Am. v Premier Albums, Inc.*, 19 AD2d 62, 63-64 [1st Dept 1963]; *Gieseking v Urania Records*, 17 Misc 2d 1034, 1035 [Sup Ct, NY County 1956]; *Metropolitan Opera Assn. v Wagner-Nichols Recorder Corp.*, 199 Misc at 799; *see also* Note, *Copyrights—Unfair Competition—Property Right*

*of Performer in Recorded Performance*, 7 Air L Rev 122, 125 [1936]).[9]

## V. The Certified Questions

Having concluded that the musical recordings here are presumptively entitled to common-law copyright protection in New York, we proceed to address the three subquestions posed by the Second Circuit.

First: "Does the expiration of the term of a copyright in the country of origin terminate a common law copyright in New York?"

When the recordings here were created in England, they received statutory copyright protection in the United Kingdom (UK) for 50 years after the date of creation (*see* Copyright Act of 1911, 1 & 2 Geo 5, ch 46, § 19). As a result, the UK copyrights for all of the recordings expired by the 1990s—years before Naxos's allegedly infringing actions. Naxos argues, and the District Court apparently agreed, that the expiration of the foreign copyrights prevents the enforcement of copyright protections in other jurisdictions, including the United States and New York. We disagree and concur with the Second Circuit's observation that "nothing in federal law denies Capitol enforceable rights in the original recordings simply because the U.K. copyrights have expired" (372 F3d 471, 480 [2d Cir 2004]).

Under the Federal Constitution, treaties that the United States enters with other countries have the force of federal law and must be respected by the states (*see* US Const art VI [2]). Although the Berne Convention and the Universal Copyright Convention both recognize the "Rule of the Shorter Term,"

---

**9.** This appears to be the position of the United States Copyright Office and the sound recording industry with respect to recordings not covered by the national Copyright Act (*see ABKCO Music, Inc. v LaVere*, 217 F3d at 690; *see also* 1 Nimmer on Copyright § 4.05 [B] [4], at 4-35; Bailey, *Phonorecords and Forfeiture of Common-Law Copyright in Music*, 71 Wash L Rev at 157; Kaplan, *Publication in Copyright Law: The Question of Phonograph Records*, 103 U Pa L Rev at 472). The international community also does not deem the sale of such a sound recording to be a "publication" (*see* Universal Copyright Convention art IV, 25 UST 1341, TIAS No. 7868 [1974]), a definition crafted on the "understanding by the delegates [to the Convention] that the issuance of phonograph records does not amount to publication under United States law" and a belief " 'that a contrary provision in the Convention would require an amendment of the United States Copyright Law unlikely to be accepted by Congress' " (Landau, *"Publication," Musical Compositions, and the Copyright Act of 1909: Still Crazy After All These Years*, 2 Vand J Ent L & Prac 29, 40 [Winter 2000] [citing Universal Copyright Convention art IV]).

which generally provides that the term of copyright in the nation where a work is first published should be applied by other nations that would grant a longer period of protection, neither treaty applies this rule to sound recordings (*see* Universal Copyright Convention art IV [4] [a], 25 UST 1341, TIAS No. 7868 [1974]; Berne Convention for the Protection of Literary and Artistic Works art 7 [8], July 24, 1971 [Paris Text], S Treaty Doc No. 99-27 [amended 1979]; 4 Nimmer on Copyright § 17.06 [A], at 17-48.2). Instead, sound recordings fall within the ambit of the Phonograms Convention but this treaty applies only to recordings fixed after the date it became law (March 10, 1974 in the United States). Furthermore, the Phonograms Convention does not contain a rule of the shorter term (*see* Convention for the Protection of Producers of Phonograms Against Unauthorized Duplication of Their Phonograms, arts 4, 7 [3], 25 UST 309, TIAS No. 7808 [1974]). Nor does the statutory implementation of the Uruguay Round Agreements Act (Pub L 103-465, 108 US Stat 4809 [1994]), which appears in 17 USC § 104A, alter the common law with respect to the recordings at issue. That provision restores United States copyright protection to certain public domain works but does not apply to recordings, like those here, that were in the public domain in the country of origin prior to 1996 (*see* 17 USC § 104A [h] [6] [B]).

Thus, neither federal statutory nor constitutional law prohibits the states from providing common-law protection to artistic works that are in the public domain in the country of origin (*see generally Hasbro Bradley, Inc. v Sparkle Toys, Inc.,* 780 F2d 189, 192-193 [2d Cir 1985]). Nothing in the statutes of this state or in our jurisprudence suggests such a prohibition is warranted. Indeed, there are indications that the opposite is true (*see* 1 Nimmer on Copyright § 5.11, at 5-90; *see also Rostropovich v Koch Intl. Corp.,* 34 USPQ2d 1609, 1614, 1995 WL 104123, *5 [SD NY 1995]), given that the copyright protection extended by state common law to sound recordings not covered by the federal Copyright Act is similar to the scope of common-law ownership rights in other forms of property, which can exist indefinitely (*see generally People ex rel. International Nav. Co. v Barker,* 153 NY 98, 101 [1897]). Until 2067, no federal or state statutory impediment constricts this common-law durational component for pre-1972 sound recordings. Applying the copyright law of the situs where the infringement occurs (*see e.g. Itar-Tass Russian News Agency v Russian Kurier, Inc.,* 153 F3d 82, 89 [2d Cir 1998]), there is no justification under New York

law for substituting the British copyright term in place of New York's common-law protection for these recordings, which continues until federal preemption occurs. We therefore answer the first subquestion in the negative because we conclude that New York provides common-law copyright protection to sound recordings not covered by the federal Copyright Act, regardless of the public domain status in the country of origin, if the alleged act of infringement occurred in New York.

Second: "Does a cause of action for common law copyright infringement include some or all of the elements of unfair competition?"

█ We understand this question to ask whether the District Court was correct to assume that some type of malicious intent or bad faith is a necessary element of a state common-law copyright infringement claim. A copyright infringement cause of action in New York consists of two elements: (1) the existence of a valid copyright; and (2) unauthorized reproduction of the work protected by the copyright (*see e.g.* L 1786, ch 54, § I). To the extent that any inference of deceptive or fraudulent intent may have been referred to in early copyright case law, it appears to have been the view that bad faith was inherent in the act of copying and selling a work without permission from a competitor because this would deprive the true owner of the work's value (*see Millar v Taylor*, 98 Eng Rep at 203, 4 Burr at 2305; *see also Capitol Records, Inc. v Wings Digital Corp.*, 218 F Supp 2d 280, 286 [ED NY 2002]). But fraud or bad faith is not an element of an infringement action in modern New York law (*see Chamberlain v Feldman*, 300 NY 135 [1949] [enjoining publication of Mark Twain manuscript on behalf of his estate's trustees in the absence of any indication of fraud or bad faith]).[10] Copyright infringement is distinguishable from unfair competition, which in addition to unauthorized copying and distribution requires competition in the marketplace or similar actions designed for commercial benefit (*see Roy Export Co. Establishment of Vaduz, Liechtenstein v Columbia Broadcasting Sys., Inc.*, 672 F2d 1095, 1105 [2d Cir 1982], *cert denied* 459 US 826 [1982]; *G. Ricordi & Co. v Haendler*, 194 F2d 914, 916 [2d Cir

---

**10.** As the United States Supreme Court has explained, a federal statutory copyright infringement cause of action consists of two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original" (*Feist Publs. v Rural Tel. Serv. Co.*, 499 US 340, 361 [1991]). Commentators are in accord (*see* 3 Goldstein, Copyright § 15.5.2, at 15:45 [2d ed 1996; 2005 Supp]; 4 Nimmer on Copyright § 13.01, at 13-5).

1952]; *Capitol Records, Inc. v Wings Digital Corp.*, 218 F Supp 2d at 286; *Metropolitan Opera Assn. v Wagner-Nichols Recorder Corp.*, 199 Misc at 793), or deception of the public (*see e.g. Shaw v Time-Life Records*, 38 NY2d 201, 206 [1975]). In response to the second subquestion, we hold that the causes of action for copyright infringement and unfair competition are not synonymous under New York law.

Third: "Is a claim of common law copyright infringement defeated by a defendant's showing that the plaintiff's work has slight if any current market and that the defendant's work, although using components of the plaintiff's work, is fairly to be regarded as a 'new product'?"

█ We begin by noting that Naxos does not contend that "market size" or "new product" issues are relevant to the existence of a common-law copyright regarding sound recordings. Its discussion of those terms is limited to the context of an unfair competition cause of action. In any event, the ability to enforce copyright protections provided by New York common law is not diminished due to the size of the market and, therefore, the popularity of a product does not affect a state common-law copyright infringement claim (*see generally* Nimmer, *Copyright in the Dead Sea Scrolls: Authorship and Originality*, 38 Hous L Rev 1, 177-179 [Spring 2001]).

Nor do we believe that a state common-law copyright claim can be defeated under the so-called "new product" analysis. We note that the Second Circuit has declared that the "[i]ndependent creation" of a new product "[can]not consist of actual copying" of an entire work (*Durham Indus., Inc. v Tomy Corp.*, 630 F2d 905, 910 [2d Cir 1980]). In the related area of the federal "fair use" doctrine, it is a general rule that the reproduction of an entire copyrighted work constitutes infringement (*see Infinity Broadcast Corp. v Kirkwood*, 150 F3d 104, 109 [2d Cir 1998], quoting 4 Nimmer on Copyright § 13.05 [A] [3], at 13-181). We see no justification for adopting a different rule of state law. Thus, even assuming that Naxos has created a "new product" due to its remastering efforts that enhance sound quality,[11] that product can be deemed to infringe on Capitol's copyright to the extent that it utilizes the original elements of

---

11. Although we express no view on whether Naxos has, in fact, created a "new product," we simply note that Capitol has a protected property interest in the performances embodied on the shellac records (*cf. Capitol Records v Greatest Records*, 43 Misc 2d 878, 880 [Sup Ct, NY County 1964]) and that Naxos is selling remastered copies of the identical performances.

the protected performances. We conclude that the third sub-question should be answered in the negative.

## VI. Conclusion

■ In light of our responses to these inquiries and our conclusion that state common law protects ownership interests in sound recordings made before 1972 that are not covered by the federal Copyright Act, the answer to the main certified question is that, without regard to the issue of abandonment, Naxos is not entitled to defeat Capitol's claim for infringement of common-law copyright in the original recordings. Accordingly, the certified question should be answered in the negative.

Chief Judge KAYE and Judges G.B. SMITH, CIPARICK, ROSEN-BLATT, READ and R.S. SMITH concur.

Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.17 of the Rules of Practice of the Court of Appeals (22 NYCRR 500.17), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in the negative.