OPINION OF THE COURT
Barbara R. Kapnick, J.
Motion sequence Nos. 002 and 005 are consolidated for disposition.
Plaintiff UMG Recordings, Inc. (plaintiff or UMG), a division of Universal Music Group, is the owner or exclusive United States licensee of the rights in sound recordings created prior to February 15, 1972 (pre-1972 recordings) of some of the most popular and successful recording artists of the twentieth century.
Defendant Escape Media Group, Inc. (defendant or Escape) developed, owns and operates the website www.grooveshark.com (Grooveshark).[1]
On January 6, 2010, UMG filed its complaint asserting two causes of action against defendant Escape for (1) common-law *211 copyright infringement of UMG’s rights in the pre-1972 recordings; and (2) unfair competition.
On February 22, 2010, Escape filed its original answer, which asserted 13 affirmative defenses. Escape then filed its first amended answer, dated June 16, 2010, which added a fourteenth and fifteenth affirmative defense, which assert that plaintiffs claims are barred by the “safe harbor” provision set forth in section 512 of the Digital Millennium Copyright Act (the DMCA), codified by 17 USC § 512, and that plaintiffs claims are preempted by section 230 of the Communications Decency Act of 1996 (the CD A), codified by 47 USC § 230 (c) (1) and (e) (3).
By order of this court on motion sequence No. 003, dated January 13, 2011, defendant was granted leave to amend its amended answer in order to assert counterclaims. The amended answer and counterclaims was filed on January 21, 2011 and contains three counterclaims for (1) a violation of the Donnelly Act, codified by New York General Business Law § 340; (2) tortious interference with contract; and (3) tortious interference with business relations.
Motion Sequence No. 002
In this motion, UMG moves, pursuant to CPLR 3211 (b), for an order dismissing Escape’s fourteenth and fifteenth affirmative defenses.
Fourteenth Affirmative Defense
The DMCA provides “safe harbors” for certain categories of Internet service providers, who would otherwise be subject to liability for copyright infringement. Here, Escape claims that it qualifies for the DMCA’s “safe harbor,” created by 17 USC § 512 (c) (1), which provides as follows:
“(c) Information residing on systems or networks at direction of users.—
“(1) In general. — A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—
“(A) (i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
*212 “(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
“(in) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;
“(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
“(C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.” (Emphasis added.)
In support of this motion, UMG argues that this protection is not available to Escape, because the word “copyright” used in section 512 (c) (1) refers exclusively to copyrights created pursuant to and protected by the US Copyright Act (17 USC § 101 et seq.). There is no dispute that in this case UMG is suing for infringement of copyrights created pursuant to and protected by New York State common law, not the Federal Copyright Act. Thus, UMG reasons that the “safe harbor” provision in the DMCA cannot be implicated, because it can only protect Internet service providers from liability for infringement of copyrights protected by the Copyright Act.
Section 301 of the Copyright Act makes clear that the copyrights of the pre-1972 recordings at issue here are not yet protected by the Copyright Act. Although section 301, which is entitled “Preemption with respect to other laws,” does preempt all state laws pertaining to rights within the general scope of copyright, subsection (c) contains one relevant exemption:
“(c) With respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067. The preemptive provisions of subsection (a) shall apply to any such rights and remedies pertaining to any cause of action arising from undertakings commenced on and after February 15, 2067. Notwithstanding the provisions of section 303, no sound recording fixed before February 15, 1972, shall be subject to copyright under this title before, on, or after February 15, 2067.” (17 USC § 301 [c]; see *213 Goldstein v California, 412 US 546, 552 [1973].)
In Capitol Records, Inc. v Naxos of Am., Inc. (4 NY3d 540, 559-560 [2005]), the Court of Appeals defined the scope of common-law copyright protection in New York:
“With the 1971, 1976 and subsequent congressional amendments to the federal Copyright Act, New York common-law protection of sound recordings has been abrogated, but only in two respects. First, the common law does not apply to any sound recording fixed, within the meaning of the federal act, after February 15, 1972, because recordings made after that date are eligible for federal statutory copyright protection. Second, state common-law copyright protection is no longer perpetual for sound recordings not covered by the federal act (those fixed before February 15, 1972), because the federal act mandates that any state common-law rights will cease on February 15, 2067. The musical recordings . . . created before February 15, 1972, are therefore entitled to copyright protection under New York common law until the effective date of federal preemption — February 15, 2067.”
Here, the issue is whether the DMCA may provide a defense or “safe harbor” to Internet service providers facing New York State common-law copyright infringement claims, as opposed to copyright infringement claims under the Copyright Act.
To date, only one court has considered the issue of whether the safe harbors provided in the DMCA apply to sound recordings fixed prior to February 15, 1972. In Capitol Records, Inc. v MP3tunes, LLC (821 F Supp 2d 627, 640 [SD NY 2011]), the Honorable William H. Pauley III concluded that “there is no conflict between section 301 and the DMCA’s safe harbors for infringement of pre-1972 recordings.”
Judge Pauley found that “Congress did not intend the grant of federal protection [to post-1972 recordings] to preempt state and common law protection of works created before 1972. To implement that policy, Congress enacted section 301(c).” (Id. at 641.) However, Judge Pauley also found that section 301 (c) does not limit
“Congress’s ability to grant immunity to qualified internet service providers for the infringement of copyrights in works fixed before 1972. Read in context, section 301(c) is an anti-preemption provision ensuring that the grant of federal copyright *214 protection did not interfere with common law or state rights established prior to 1972. But section 301(c) does not prohibit all subsequent regulation of pre-1972 recordings . . .
“The text of the DMCA limits immunity for the ‘infringement of copyrights’ without drawing any distinction between federal and state law. . . . It is beyond dispute that the common law meaning of the term ‘copyright infringement’ encompasses violations of both federal and state protections . . .
“The plain meaning of the DMCA’s safe harbors, read in light of their purpose, covers both state and federal copyright claims. Thus, the DMCA applies to sound recordings fixed prior to February 15, 1972.” (Id. at 641-642.)
An Internet service provider which seeks to benefit from the safe harbor provisions of the DMCA is required, as a condition of receiving such protection, “expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.” (§ 512 [c] [1] [C]; see also § 512 [b] [2] [E].) Certainly, the thrust of the DMCA is to relieve Internet service providers of the initial need to ascertain the copyright status of the sound recordings that they make available, to place the burden of asserting copyright ownership on the owners of such copyrights, and to require the Internet service providers to “take down” infringing material, upon receipt of a valid notice of infringement. There is no textual, or other, reason to think that Congress intended to limit that distribution of responsibilities to only post-1972 recordings.
Moreover, the phrase “copyright owner,” found in 17 USC § 512 (c) (3) (A) (v), is applicable to the owner of a common-law copyright, no less than to the owner of a copyright under the Copyright Act. (Capitol Records, Inc. v MP3tunes, LLC, 821 F Supp 2d at 641; see also Capitol Records, Inc. v Naxos of Am., Inc., 4 NY3d at 558; Fleischer Studios, Inc. v A.V.E.L.A., Inc., 654 F3d 958, 964 [9th Cir 2011].)
Also, the term “infringing,” found in 17 USC § 512 (c) (3) (A) (iii), is no less applicable to common-law copyright than to statutory copyright. (See Capitol Records, Inc. v Naxos of Am., Inc., 372 F3d 471, 478 [2d Cir 2004]; Naxos of Am., Inc., 4 NY3d at 563.)
Indeed, the Copyright Act recognizes that both state statutes and common law grant exclusive rights, and it preempts such *215 laws to the extent that the rights that they confer are “equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.” (17 USC § 301 [b] [3].)
In sum, there is no indication in the text of the DMCA that Congress intended to limit the reach of the safe harbors provided by the statute to just post-1972 recordings. As Judge Pauley also observed:
“the DMCA was enacted to clarify copyright law for internet service providers in order to foster fast and robust development of the internet. Limiting the DMCA to recordings [fixed] after 1972, while excluding recordings before 1972, would spawn legal uncertainty and subject otherwise innocent internet service providers to liability for the acts of third parties. After all, it is not always evident . . . whether a song was recorded before or after 1972.” (Capitol Records, Inc., 821 F Supp 2d at 642.)
The parties made additional letter submissions earlier this year to bring to this court’s attention a letter dated December 28, 2011, addressed to the Honorable John Boehner, Speaker of the United States House of Representatives, from Maria A. Pallante, the Register of Copyrights, whereby she submitted a report to Congress in response to a directive in the Explanatory Statement to the Omnibus Appropriations Act of 2009. {See Copyright Office, http://www.copyright.gov/docs/sound/.) The report recommends that federal copyright protection be extended to sound recordings fixed on or before February 15, 1972, and that the safe harbor provisions of section 512 be applicable to such recordings. The report, however, takes issue with Judge Pauley’s decision in Capitol Records, Inc., stating that his determination that “ ‘[t]he text of the DMCA limits immunity for the “infringement of copyrights” without drawing any distinction between federal and State law’ ” (report at 131, quoting Capitol Records, Inc. at 641) was made “despite the fact that section 301(c) states ‘[w]ith respect to sound recordings first fixed before February 15, 1972, any rights or remedies under the common law or statute of any State shall not be annulled or limited by this title until February 15, 2067.’ ” (Id.)
The report further states that
“[s]ection 512(c) does not include any provision explicitly limiting remedies available for owners of pre-1972 sound recordings. Instead, section 512(c) refers to ‘infringement of copyright’ which is defined *216 in section 501(a) as the violation of ‘any of the exclusive rights of the copyright owner as provided by sections 106 through 122.’ The fact that the term ‘infringement of copyright’ only refers to infringement of rights protected under title 17, and does not include infringement of rights protected under common law or statute of any State, could not be more clear.” (Id. at 131-132.)
Finally, the report asserts that “it is for Congress, not the courts, to extend the Copyright Act to pre-1972 sound recordings, both with respect to the rights granted under the Act and the limitations on those rights (such as section 512) set forth in the Act.” (Id. at 132.)
However, it is for the courts to interpret the applicable statutes and decide the issues raised by this motion. This court is not attempting to extend the Copyright Act to pre-1972 recordings, but, nonetheless, does find, based on the relevant language of the statutes and the analysis discussed above, that the safe harbor provision codified by section 512 (c) (1) of the DMCA is applicable to pre-1972 recordings.
Accordingly, that portion of UMG’s motion seeking to dismiss the fourteenth affirmative defense is denied.
Fifteenth Affirmative Defense
The CDA (47 USC § 230) protects providers and users of computer interactive services from certain forms of liability. 47 USC § 230 (c) (1) provides, in relevant part, that “[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.” 47 USC § 230 (e) provides, in relevant part:
“(e) Effect on other laws
“(1) No effect on criminal law
“Nothing in this section shall be construed to impair the enforcement of . . . any . . . Federal criminal statute.
“(2) No effect on intellectual property law

“Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

“(3) State law
“Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action *217 may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.
“(4) No effect on Communications Privacy law
“Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act ... or any similar State law.” (Emphasis added.)
UMG argues that Escape’s fifteenth affirmative defense must be dismissed because the causes of action alleged in the complaint “pertain[ ] to intellectual property,” under 47 USC § 230 (e) (2), and, therefore, are not barred by the CDA.
Escape, however, argues that the phrase, “any law pertaining to intellectual property,” pertains solely to federal intellectual property law. Escape relies on the decision in Perfect 10, Inc. v CCBill LLC (488 F3d 1102, 1107-1108 [9th Cir 2007]), in which the court noted that the term “intellectual property” is not defined in the statute, and that “[s]tates have any number of laws that could be characterized as intellectual property laws: trademark, unfair competition, dilution, right of publicity and trade defamation, to name just a few.” (Perfect 10, 488 F3d at 1107.) The court reasoned that “[a]s a practical matter, inclusion of rights protected by state law within the ‘intellectual property’ exemption would fatally undermine the broad grant of immunity provided by the CDA.” (Id. at 1108.) The court did not expressly find the language of section 230 (e) (2) to be ambiguous. Rather, citing section 230 (a) and (b), it construed the term “intellectual property” in subsection (e) (2) to mean “federal intellectual property,” in light of “Congress’s expressed goal of insulating the development of the Internet from the various state-law regimes.” (Id. at 1118-1119; see also Ford Motor Co. v GreatDomains.com, Inc., 2001 WL 1176319, *1, 2001 US Dist LEXIS 24780, *2-3 [ED Mich 2001].)
On the other hand, in Atlantic Rec. Corp. v Project Playlist, Inc. (603 F Supp 2d 690, 704 [SD NY 2009]), the court held that the plain meaning of the word “any,” in section 230 (e) (2), embraces state, as well as federal, intellectual property laws. The court noted that at four different points in the statute, Congress specified whether it intended a subsection to apply to local, state or federal law, i.e., section 230 (e) (1) expressly refers to “Federal criminal statute”; section 230 (e) (3) expressly refers to “State law” and to “any State or local law”; and section 230 *218 (e) (4) refers to a particular federal law and to “any similar State law.” (Id. at 703.) “It is therefore clear from the statute,” the court concluded, “that if Congress wanted the phrase ‘any law pertaining to intellectual property’ to actually mean ‘any federal law pertaining to intellectual property,’ it knew how to make that clear, but chose not to.” (Id.; see also Doe v Friendfinder Network, Inc., 540 F Supp 2d 288, 300 [D NH 2008].)
This court agrees that the word “any” in section 230 (e) (2) means what it says. Generally, a court “need not look further than the unambiguous language of the statute to discern its meaning.” (Jones v Bill, 10 NY3d 550, 554 [2008].) Accordingly, the motion to dismiss the fifteenth affirmative defense is granted.
Motion Sequence No. 005
In this motion, UMG moves, pursuant to CPLR 3211 (a) (7), for an order dismissing Escape’s counterclaims.
Factual Allegations
With respect to the first counterclaim for violation of General Business Law § 340, Escape alleges that because UMG owns and controls the largest catalogue of recorded music in the world, it controls a substantial share of the market for the dissemination of recorded music, including dissemination over the Internet and within the State of New York, and that this control affords plaintiff substantial leverage and power in this marketplace. Furthermore, defendant alleges that it is a competitor of UMG and that UMG’s unlawful, anticompetitive campaign “to exploit its sizeable market power by coercing third-party business entities into refusing to deal with Escape” has caused Escape to suffer significant damages. (Counterclaims UK 56-59, 63.)
As to the second counterclaim for tortious interference with contract, defendant further contends that plaintiff improperly coerced nonparties (1) Hewlett Packard (HP) and (2) INgrooves to breach their contracts and terminate their relationships with Escape, causing Escape significant financial detriment. Upon information and belief, defendant contends that plaintiff’s conduct has also caused other third-party businesses to refuse to do business with Escape.
With respect to HU Escape alleges that HP is involved in a partnership, joint venture or similar business relationship with UMG and/or UMG’s affiliate Interscope Records, concerning the *219 design, manufacture and distribution of audio headphones. This business venture is referred to as “HP Beats.” (Counterclaims 1115.) In or about April 2010, Escape submitted a proposal to host an online advertising campaign for HP Beats on the Grooveshark website. (Id. If 16.) On or about June 9, 2010, HP approved Escape for a $325,000 advertising campaign for HP Beats, conditioned upon Escape’s agreement to remove all UMG/ Interscope branding from the campaign. On or about June 22, 2010, Grooveshark entered into a written contract that was signed by Omnicom Media Group (Omnicom), as agent for HI] for the $325,000 advertising campaign, which was set to commence on or about July 17, 2010 and continue until about August 15, 2010. (Id. 1Í1117-19.)
On or about July 9, 2010, Omnicom advised Grooveshark that it would no longer be permitted to promote the HP Beats campaign and that the advertising campaign would now focus on the HP Envy Laptop. The newly designed campaign ran on the Grooveshark website from July 17, 2010 to July 29, 2010, until Omnicom demanded, on behalf of HI] that Escape remove the HP advertisement from its website immediately. According to Escape, HP’s alleged breach was caused by UMG, who contacted HP officers, including its chief executive officer, and threatened to terminate plaintiffs business relationships with HP unless it pulled its advertising from the Grooveshark website. (Id. lili 20-23.)
Next, defendant alleges that nonparty INgrooves, a digital music distribution company that represents, inter alia, a large portion of UMG’s catalogue of recorded music, including certain pre-1972 recordings, entered into a digital streaming license agreement with Escape, effective June 23, 2009 (the INgrooves agreement), pursuant to which INgrooves granted Escape a non-exclusive license to reproduce and stream various recordings through the Grooveshark website. Escape alleges, upon information and belief, that UMG or a corporate affiliate thereof owns a substantial equity interest in INgrooves. (Id. lili 27-29.)
On August 11, 2010, Escape received a letter from INgrooves, which claimed that Escape had breached their agreement because the statement, “Grooveshark has secured licenses from INgrooves,” appeared on the website Digital Media Wire, without INgrooves’ consent. Based on this, INgrooves suspended the INgrooves agreement, ostensibly to evaluate whether or not to terminate it. Escape contends that the “suspension,” which was still in force when the answer was filed, is clearly pretex *220 tual and a result of UMG’s demands, especially considering paragraph 15 of the agreement, which addresses “Confidentiality” and provides that “[e]ach party may refer generally to the existence of the Agreement” in communications with third parties. (Id. 1ÍK 30-34.)
Finally, the third counterclaim for tortious interference with business relations also alleges that plaintiff interfered with Escape’s business relationships with HP and INgrooves, based on the allegations discussed above, in addition to its business relationship with nonparty Apple.
With respect to Apple, Escape alleges that on or about August 31, 2009, Escape submitted a version of its Grooveshark application to Apple for its review. Shortly thereafter, following discussions with Apple representatives, Escape made several changes to its application and resubmitted an updated version on two separate occasions. On June 24, 2010, Apple advised Escape that it required additional time to review the Groove-shark application and repeatedly inquired about the status of the pending litigation between UMG and Escape. On August 5, 2010, Escape was advised that Apple had approved its Groove-shark application and that it would be made available for sale in the iPhone App Store on August 11, 2010, pursuant to a written agreement between Escape and Apple. (Id. 1Í1Í 36-40.)
On August 16, 2010, Escape received an email from Apple advising that its application had been removed from the iPhone App Store, in the face of “a written notice from Universal Music Group International that Universal Music Group International believes your application named ‘Grooveshark’ infringes on Universal Music Group International’s rights.” The notice directed Escape to contact a specific UMG employee to further discuss the termination of its contract.[2] (Id. 1141.)
*221 Discussion
In support of its motion, plaintiff first argues that the NoerrPennington doctrine requires dismissal of all of the counterclaims.
The Noerr-Pennington doctrine is named for two United States Supreme Court cases: Eastern Railroad Presidents Conference v Noerr Motor Freight, Inc. (365 US 127 [1961]) and Mine Workers v Pennington (381 US 657 [1965]). The doctrine holds that parties may not be subject to liability for petitioning the government or a governmental agency for a redress of grievances, such as by filing litigation. (I.G. Second Generation Partners, L.P. v Duane Reade, 17 AD3d 206, 208 [1st Dept 2005]; Concourse Nursing Home v Engelstein, 278 AD2d 35 [1st Dept 2000].) In other words, the “filing of litigation falls within the protection of the Noerr-Pennington doctrine, which has been applied to bar claims of tortious interference predicated on the commencement of litigation.” (I.G. Second Generation Partners, 17 AD3d at 208, citing Matsushita Elecs. Corp. v Loral Corp., 974 F Supp 345 [SD NY 1997]; Concourse Nursing Home, 278 AD2d at 35.)[3]
In the instant case, plaintiff relies, inter alia, on Barq’s Inc. v Barq’s Beverages, Inc. (677 F Supp 449 [ED La 1987]) and Castaline v Aaron Mueller Arts (2010 WL 583944, 2010 US Dist LEXIS 13111 [ND Cal 2010]) and maintains that under the Noerr-Pennington doctrine, it had an absolute right to contact and even threaten third parties with litigation as an incident to the effective enforcement of its legal interests.
In Barq’s, a case also based on a trademark infringement claim, the court held that the plaintiffs letters to defendant’s bottle cap suppliers, urging the suppliers not to do business with the defendant, were “incidental” to plaintiffs good faith litigation against the defendant, and that, therefore, they were protected by the Noerr-Pennington doctrine.
In the instant case, however, plaintiffs alleged interference with defendant’s contract with HI] as well as plaintiffs alleged interference with the licensing agreement between defendant and INgrooves, was not “incidental” to plaintiffs common-law copyright infringement and unfair competition claims.
*222 UMG’s reliance on Castaline is similarly misplaced. In that case, the court held that the plaintiff’s threats to sue third-party purchasers of defendant’s allegedly trademark-infringing products, and to refuse to sell its products to such third parties, were not subject to the sham litigation exception to First Amendment immunity and were protected by the NoerrPennington doctrine.
Here, by contrast, UMG’s alleged communications with HP and INgrooves did not constitute an attempt to halt Escape’s dissemination of the allegedly copyright-infringing recordings, but rather, are alleged to have constituted an economic attack on the whole of Escape’s business. For sure, at least some of the acts alleged in the counterclaims were not “reasonably and normally attendant upon effective litigation” (Coastal States Mktg., Inc., 694 F2d at 1367), and, therefore, the court will not extend the protection of the Noerr-Pennington doctrine, as it applies to litigation, to acts allegedly undertaken to harm a competitor, where such acts are not related in a reasonably direct manner to halting the acts complained of in the underlying litigation. (See Alexander v National Farmers Org., 687 F2d 1173, 1200 [8th Cir 1982] [denying protection to threats against defendant’s customers].) Accordingly, defendant’s counterclaims cannot be dismissed on the basis of the Noerr-Pennington doctrine.
First Counterclaim
UMG argues that the counterclaim alleging a violation of the Donnelly Act must also be dismissed because Escape alleges only an injury to itself, rather than an adverse effect on competition as a whole in the relevant market, and because the counterclaim fails to allege any nexus between the acts complained of and any harm to consumers or competition. The first counterclaim alleges, inter alia, that
“UMG’s conduct was intended to undermine, and has undermined, competition in the market for dissemination of recorded music on the Internet by injuring a competitor of UMG — i.e., Escape — that provides an additional option to consumers for listening to recorded music, including within the State of New York.” (Counterclaims If 62.)
It is well settled that the antitrust laws were enacted for the “protection of competition, not competitors” (Brown Shoe Co. v United States, 370 US 294, 320 [1962] [emphasis added]), and that injury to a competitor is not, without more, injury to *223 competition as a whole. (See e.g. Aspex Eyewear, Inc. v Vision Serv. Plan, 389 Fed Appx 664, 666 [9th Cir 2010]; E & L Consulting, Ltd. v Doman Indus. Ltd., 472 F3d 23, 31 [2d Cir 2006], cert denied 552 US 816 [2007].) Here, Escape alleges no more than a conclusory claim, devoid of any factual support, that the injury done to it constituted injury to competition. Accordingly, the motion to dismiss the first counterclaim is granted.
Second and Third Counterclaims
In support of its motion to dismiss the second and third counterclaims for tortious interference with contract and business relations, UMG first argues that it has a justification defense because it cannot be liable for tortious interference when it was alerting a third party to the alleged copyright infringement. (P. Kaufmann, Inc. v Americraft Fabrics, Inc., 232 F Supp 2d 220, 225 [SD NY 2002] [“Seeking to protect a copyright by alerting a third party that the copyright is being infringed constitutes a justification defense to this (tortious interference with contract) claim”].)
Plaintiff next argues that even if the justification defense is not a ground to dismiss these claims, they still fail, because UMG had a legal and economic interest to advance its own preexisting business relationships with HP and INgrooves, and that, in order for Escape to assert an interference claim, it was required to plead facts demonstrating that UMG acted with malice or through improper means, which it has failed to do. (See Foster v Churchill, 87 NY2d 744, 749-751 [1996].) Plaintiff also argues that since it is not a stranger to the INgrooves agreement, it cannot be liable for tortious interference with that contract.
Defendant argues that these defenses raise factual issues, and while they may be properly raised in plaintiff’s reply to the counterclaims, they cannot serve as the basis to dismiss the second and third counterclaims.
In reply, plaintiff argues that the defenses it raises do not raise factual issues because defendant itself alleges that UMG was in a “partnership, joint venture or similar business relationship” with HP and owned a “substantial equity interest” in INgrooves, and, therefore, there is no factual issue regarding UMG’s possession of legal and economic interests in the businesses of these third parties. In addition, plaintiff points out again that Escape has failed to adequately plead malice or wrongful means.
*224 Plaintiffs argument, however, is misplaced. A party raising an economic defense to a claim of tortious interference with an existing contract must show “that it acted to protect its own legal or financial stake in the breaching party’s business.” (White Plains Coat & Apron Co., Inc. v Cintas Corp., 8 NY3d 422, 426 [2007]; see also Foster v Churchill, 87 NY2d at 751 [defendants were clearly acting in the interests of the company in which they had invested, which was on the brink of insolvency]; Schutty v Speiser Krause P.C., 86 AD3d 484, 486 [1st Dept 2011] [member of firm acted on behalf of firm to protect his interest therein].) To the contrary, a party acting in its own direct interest, rather than to protect its stake in the breaching party, may not raise the economic interest defense. (See Wells Fargo Bank, N.A. v ADF Operating Corp., 50 AD3d 280, 281 [1st Dept 2008].)
While the counterclaims here allege that UMG was engaged in a venture with HP to develop audio headphones, and that UMG, or one of its affiliates, owns a substantial equity interest in INgrooves, those relationships would offer UMG a defense only if it had acted to protect its interest in those relationships, not if, as the counterclaims allege, it used those relationships to coerce HP and INgrooves to breach their contracts with Escape, merely to damage Escape’s business and achieve a direct benefit to itself. Accordingly, the court will not, at this stage, dismiss the second and third counterclaims based upon the economic interest defense.
Similarly, the court will not dismiss the second and third counterclaims based upon the justification defense applied in P. Kaufmann, Inc. In that case, a federal district court, applying New York law in its analysis of a tortious interference with contract claim, dismissed the counterclaim because it found that the alleged injury suffered by defendant resulted from the plaintiff alerting third parties that its copyright was being infringed upon. In making this finding, the court relied upon Shapiro & Son Bedspread Corp. v Royal Mills Assoc. (764 F2d 69, 75 [2d Cir 1985]), which held that plaintiffs “actions in notifying [defendant’s] customers that [defendant] was infringing [plaintiffs] copyright and that this could have adverse legal consequences for sellers of [defendant’s] allegedly infringing product” were not improper because plaintiff had a valid copyright and sellers of infringing works may indeed be subject to sanctions under the Copyright Act.
Here, however, unlike in P. Kaufmann, Inc. and Shapiro, the allegations in the counterclaims are not that UMG tortiously *225 interfered by contacting Escape’s customers or users of the Grooveshark service, but that it coerced third parties to breach their contracts with Escape, to damage Escape’s business and achieve a direct benefit to itself.
The court must also separately consider whether Escape has pleaded malice or improper means with respect to the second or third counterclaims.[4]
For purposes of a claim of tortious interference with business relations, misrepresentation constitutes an improper means. (Carvel Corp. v Noonan, 3 NY3d at 191; Krinos Foods, Inc. v Vintage Food Corp., 30 AD3d 332, 333 [1st Dept 2006].)
Here, Escape alleges that UMG acted with the goal of injuring Escape and forcing it out of business through coercion and threats and purposeful misrepresentations of the nature of Escape’s business and the Grooveshark service. The court recognizes that these allegations are necessarily somewhat conclusory, since Escape is not privy to UMG’s communications with third parties and has not yet had an opportunity to take discovery on this issue. However, at this stage, viewing the counterclaims in the light most favorable to the defendant, the court finds that the claim for tortious interference with business relations sufficiently alleges malice or improper means and will not be dismissed.
The court also notes that plaintiff specifically argues, with respect to the INgrooves agreement, that it cannot be liable for tortious interference with a contract because “only a stranger to a contract, such as a third party, can be liable for tortious interference with a contract” (Koret, Inc. v Christian Dior, S.A., 161 AD2d 156, 157 [1st Dept 1990]), and here, even according to defendant, plaintiff has a significant equity interest in IN-grooves and is, therefore, not a “stranger” to the contract.
Defendant, on the other hand, asserts that this argument fails because there is no support for plaintiffs assertion that, merely because it is alleged that UMG holds a “substantial *226 equity interest” in INgrooves, it is not a “stranger” to the IN-grooves agreement.
To support its proposition that it cannot be liable for tortious interference with the INgrooves agreement because it is not a “stranger” to that agreement, plaintiff relies on MTI/Image Group v Fox Studios E. (262 AD2d 20 [1st Dept 1999]). In that case, the Appellate Division, First Department held that the lower court erred in not dismissing (on summary judgment) a cause of action for tortious interference with contractual relations and prospective economic advantage because “the corporate agents who allegedly committed the tort were simultaneously acting as agents (in negotiating and executing the contracts) of Morning Studios, the signatory to the contracts.” (Id. at 23-24.)
Here, the allegation that UMG has a “substantial equity interest” in INgrooves does not amount to an agency relationship akin to the one found by the court in MTI/Image Group. Moreover, there are no allegations here that UMG was involved in “negotiating and executing” the INgrooves agreement or acted as an agent for INgrooves. Therefore, insofar as the counterclaims allege tortious interference with the INgrooves agreement or with Escape’s business relationship with IN-grooves, they cannot be dismissed at this time merely because Escape has alleged that UMG has a “substantial equity interest” in INgrooves.
Accordingly, it is hereby ordered that, in motion sequence No. 002, the motion by plaintiff UMG Recordings, Inc. is granted to the extent that defendant’s fifteenth affirmative defense is dismissed, and is otherwise denied; and it is further ordered that, in motion sequence No. 005, the motion by plaintiff is granted to the extent that the first counterclaim is dismissed, and is otherwise denied; and it is further ordered that plaintiff is directed to serve its reply to the second and third counterclaims within 20 days of service upon it of a copy of this order with notice of entry.

. According to plaintiff, through this website, users can upload digital copies of recordings, including pre-1972 recordings, which Escape then copies to its servers. Thereafter, when any user wants to obtain a copy of the recording, he or she can simply type in the name of the song or artist and the website will provide a list of the music files in the Grooveshark library matching those terms. When the user clicks on a particular recording from the search results, Escape sends a digital copy of that recording from its servers to the user’s personal computer. Users can either listen to the copy or make additional permanent copies thereof.

. The court notes that Escape also generally claims that UMG has attempted, albeit less successfully, to interfere with its business relationships with other nonparties Google and MusicAds.
With respect to Google, Escape claims that UMG has contacted Google and demanded that it remove the Grooveshark application from the online “Android App Store.” According to Escape, despite UMG’s attempts, the Grooveshark application was still being sold in the Android App Store as of the date of the filing of the answer.
Similarly, Escape alleges that MusicAds, a company based in Madrid, which sells excess “banner” style advertising space on music-oriented websites, has been pressured by UMG employees to terminate its relationship with Escape, who has repeatedly used MusicAds to sell Grooveshark’s excess advertising space.

. Although the Noerr-Pennington doctrine initially arose in the antitrust field, it has also come to protect certain private litigation-related activities, such as sending cease and desist letters, as well as sending settlement-related communications. (See e.g. McGuire Oil Co. v Mapco, Inc., 958 F2d 1552 [11th Cir 1992]; Coastal States Mktg., Inc. v Hunt, 694 F2d 1358 [5th Cir 1983].)

. To sufficiently plead a claim for tortious interference with business relations, as opposed to a tortious interference with contract claim, the injured party must plead malice or improper means. (Carvel Corp. v Noonan, 3 NY3d 182, 190 [2004]; Shared Communications Servs. of ESR, Inc. v Goldman Sachs & Co., 23 AD3d 162, 163 [1st Dept 2005]; Reid v Ernst & Young Global Ltd., 13 Misc 3d 1242[A], 2006 NY Slip Op 52298[U], *5 [Sup Ct, NY County, Nov. 15, 2006].) The element of malice or improper means for the tortious interference with contract claim is implicated here only because of UMG’s assertion of the economic interest defense.