OPINION OF THE COURT
Eileen Bransten, J.
In this action, plaintiffs Andy Miller and ASM Sports (ASM) bring tortious interference, unjust enrichment, unfair competí *419 tion, and prima facie tort claims against rival sports management firms and their principals, stemming from defendants’ purported “theft” of plaintiffs’ client, Larry Sanders.[1] Defendants now seek dismissal of plaintiffs’ claims pursuant to CPLR 3211 (a) (7). For the reasons that follow, defendants’ motion to dismiss for failure to state a cause of action is granted.
I. Background[2]
Plaintiff Andy Miller is the founder and president of plaintiff ASM, a sports management firm. (Complaint ¶ 34.) Defendants Relativity Sports, LLC, Relativity Media, LLC, and Rogue Sports, LLC likewise are sports management firms and are affiliated with each other. (Id. ¶ 35.) Defendant Happy Walters is the chief operating officer of Relativity Sports, while defendant Dan Fegan is the president of Relativity Sports’ basketball division. {Id.)
According to the complaint, Larry Sanders retained plaintiff Miller as his agent before Sanders’ second season in the National Basketball Association (NBA). (Id. ¶ 42.) On December 17, 2011, Miller and Sanders executed a standard player agent contract (SPAC). (Id. ¶ 43.) By its terms, the SPAC remained in effect “until the expiration date of any player contract executed pursuant to [the SPAC] or any extension, renewal or modification of [Sanders’] contract, whichever occurs later; provided, however, that either party may terminate this Agreement effective fifteen (15) days after written notice of termination is given to the other party.” (Id. ¶ 45.)
From December 2011 through July 2013, plaintiffs allege that Miller invested significant time and ASM resources in fostering Sanders’ development. (Id. ¶¶ 47-58.) These efforts, both on and off the court, purportedly “paid off in dramatic fashion” by the start of Sanders’ third season in the NBA. (Id. ¶ 59.) The complaint deems Sanders’ third season his “break out year.” (Id. ¶ 61.)
After the end of Sanders’ third season, Miller began working to negotiate a new contract for Sanders. (Id. ¶ 63.) While Miller *420 was negotiating on Sanders’ behalf, the complaint alleges that defendant Walters “was lurking in the shadows together with Fegan ready to strike with an outrageously deceptive scheme designed to steal Sanders away from Miller and to reap all of the fruit [sic] of Miller’s efforts.” (Id. ¶ 67.) As evidence of Walters and Fegan’s scheme, plaintiffs contend that defendants recruited Sanders’ former girlfriend, Cree Nix, to help convince Sanders to leave Miller, promising her a job and 1% of the commission to be earned by defendants. (Id. ¶ 69; see revised aff of J.R. Hensley in support of plaintiffs’ opp ¶ 44.) In addition, plaintiffs allege that defendants enlisted one of Sanders’ childhood friends, Seth Willmot, to assist in their efforts. (Id. ¶ 68.)
On July 16, 2013, Miller and Sanders met in Las Vegas. (Id. ¶ 70.) During the dinner, Sanders allegedly exhibited a “belligerent” attitude and demanded that Willmot receive 1% of Sanders’ total contract (or 25% of Miller’s own 4% fee) in his role as Sanders’ “manager.” (Id. ¶ 71.) When Miller rejected Sanders’ proposal, Sanders explained that he planned to meet with defendant Fegan later that evening and that Fegan indicated that he would agree to such a deal. (Id.) Sanders also recounted a number of statements made to him by defendant Fegan, including that Sanders was a “max player,” i.e., a player that could secure the maximum amount of compensation permissible in the NBA. (Id. ¶ 72.) In addition, Fegan allegedly stated that he would get Sanders acting roles and secure acting lessons for Willmot. (Id.)
After the dinner, Miller continued contract negotiations on behalf of Sanders. (Id. ¶ 75.) On July 25, 2013, Miller negotiated a $41 million contract for Sanders. (Id. ¶ 76.) Nonetheless, that evening, Willmot called Miller to inform him that Sanders was terminating Miller due to his failure to agree to give Willmot the 1%, i.e., the 1% of Sanders’ total contract that was requested during the Las Vegas dinner. (Id. ¶ 77.) The next day, Sanders faxed a termination notice to Miller. (Id. ¶ 82.)
Shortly thereafter, Miller learned that Sanders hired Walters and Fegan as his agents. (Id. ¶ 78.) Plaintiffs contend that Sanders then signed a contract extension with the Milwaukee Bucks for $44 million over four years. (Id. ¶ 83.) The extension was purportedly negotiated by defendants Walters and Fegan. (Id.)
Miller and ASM then filed the instant action, asserting four claims against defendants: (1) tortious interference with business relationships; (2) unjust enrichment; (3) unfair competition; and (4) prima facie tort.
*421 II. Discussion
A. Defendants’ CPLR 3211 (a) (7) Motion
1. Motion to Dismiss Standard
Defendants now seek dismissal of each count of the complaint for failure to state a cause of action. On a motion to dismiss brought pursuant to CPLR 3211 (a) (7), all factual allegations must be accepted as truthful, the complaint must be construed in a light most favorable to the plaintiffs and the plaintiffs must be given the benefit of all reasonable inferences. (Allianz Underwriters Ins. Co. v Landmark Ins. Co., 13 AD3d 172, 174 [1st Dept 2004].) “We . . . determine only whether the facts as alleged fit within any cognizable legal theory.” (Leon v Martinez, 84 NY2d 83, 87-88 [1994].) This court must deny a motion to dismiss, “if from the pleadings’ four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law.” (511 W. 232nd Owners Corp. v Jennifer Realty Co., 98 NY2d 144, 152 [2002] [internal quotation marks and citations omitted].)
2. Tortious Interference with Business Relations
To state a claim for tortious interference with business relations, plaintiffs must allege that “(a) the plaintiff had business relations with a third party; (b) the defendant interfered with those business relations; (c) the defendant acted with the sole purpose of harming the plaintiff or by using unlawful means; and (d) there was resulting injury to the business relationship.” (Thome v Alexander & Louisa Calder Found., 70 AD3d 88, 108 [1st Dept 2009]; see also Amaranth LLC v J.P. Morgan Chase & Co., 71 AD3d 40, 47 [1st Dept 2009].)[3]
*422 Defendants first attack plaintiffs’ pleading, arguing that the complaint fails to allege that defendants acted solely to injure plaintiffs. Plaintiffs do not dispute this argument. Instead, plaintiffs contend that they need not show that defendants acted solely to injure plaintiffs because they have alleged “wrongful means.” (See plaintiffs’ revised opp brief at 6.)
Plaintiffs are correct that the third element of a tortious interference with business relations claim is framed in the disjunctive and requires a showing of either (1) “sole purpose” or (2) unlawful or “wrongful means.” (See Willis Re Inc. v Hudson, 29 AD3d 489, 490 [1st Dept 2006].) However, having failed to demonstrate “sole purpose,” plaintiffs’ claim fails because the complaint does not plead “wrongful means.”
a. Wrongful Means
“ ‘Wrongful means’ include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract.” (Carvel Corp. v Noonan, 3 NY3d 182, 191 [2004].) “[A]s a general rule, the defendant’s conduct must amount to a crime or an independent tort.” (Id. at 190.)
Plaintiffs first contend that the “wrongful means” employed by defendants were “fraudulent representations made by Defendants to Sanders.” In particular, plaintiffs cite to defendants’ representations to Sanders that he was a “max player” and that they could secure movie roles for him. While plaintiffs baldly state that these representations are false, they offer no factual allegations from which it could be inferred that any of these statements were actually false or knowingly false when made. Although plaintiffs spill much ink citing to cases in which misrepresentations were found to be a sufficient basis for a tortious interference claim, in each case, the courts emphasized that the pleading set forth a basis from which falsity could be inferred. (See Stapleton Studios, LLC v City of New York, 26 AD3d 236, 237 [1st Dept 2006] [sustaining tortious interference claim based on slander and business defamation allegations where statements were “reasonably susceptible of defamatory connotation”]; UMG Recs., Inc. v Escape Media Group, Inc., 37 Misc 3d 208, 225 [Sup Ct, NY County 2012] [deeming representations misstating the nature of defendant’s business sufficient to state tortious interference counterclaim].) Accordingly, plaintiffs have not alleged that the misrepresentations constituted an “independent tort” and therefore have not satisfied the requisite “wrongful means” element of their claim.
*423 Plaintiffs next assert that defendants committed the “independent tort” of “commercial bribery” and that this bribery suffices to set forth “wrongful means.” Plaintiffs cite only to Fourth Department case law in setting forth the elements of the commercial bribery tort. (See plaintiffs’ revised opp brief at 7.) However, while the Fourth Department considers commercial bribery to be a viable tort claim, the First Department has held that there is no private civil cause of action for commercial bribery. (Compare Niagara Mohawk Power Corp. v Freed, 265 AD2d 938, 939 [1999] [“Contrary to defendants’ contention, commercial bribery can constitute a civil cause of action”], with Sardanis v Sumitomo Corp., 279 AD2d 225, 230 [1st Dept 2001] [deeming no private right of action under the commercial bribery provisions of the Penal Law “notwithstanding a contrary ruling by the Fourth Department in Niagara Mohawk Power Corp. v Freed”].) Thus, in the First Department, “commercial bribery” does not constitute an “independent tort” and cannot be considered a “wrongful means” on this ground.
Although plaintiffs do not make this argument, commercial bribery is a crime under the Penal Law (see Penal Law § 180.03), and could be considered a “wrongful means” on this basis. However, plaintiffs’ allegations do not suffice to state a commercial bribery claim under the Penal Law. Plaintiffs’ commercial bribery allegation stems from defendants’ alleged payment of cash and promise of acting lessons to Willmot. According to plaintiffs, these acts conferred a benefit on Willmot—not for managerial services, but to influence Willmot’s conduct— without Sanders’ knowledge. (See plaintiffs’ revised opp brief at 7.) This argument, while novel, collapses under its own weight. Under the Penal Law, to state a commercial bribery claim, it must be alleged that “the bribe was offered without the knowledge of the proposed recipient’s principal.” (Jaggie v Northstar Tubular Corp., 195 AD2d 336, 336-337 [1st Dept 1993].) Here, the complaint itself alleges that Sanders, the purported victim of the bribery, was not only aware of, but requested, that the payment at issue be made to Willmot. (Complaint ¶ 71.) In fact, the complaint alleges that Sanders switched agents because Miller would not make the payment. (Id. ¶ 77.) Accordingly, plaintiffs’ commercial bribery allegations fail to allege the wrongful means necessary to state a tortious interference with business relations claim.
Plaintiffs’ remaining arguments as to “wrongful means” fare no better. Plaintiffs contend that defendants induced Willmot *424 and Nix to breach their fiduciary duties to Sanders by giving him advice that was based on their own interests rather than what was best for Sanders. {See plaintiffs’ revised opp brief at 8.) Plaintiffs contend that Willmot and Nix owed such duties to Sanders as his close friend and sometimes girlfriend, respectively. Regardless of whether Sanders’ personal relationships with Willmot and Nix give rise to fiduciary obligations with regard to Sanders’ professional representation and dealings with Miller, plaintiffs’ pleading fails to plead with particularity that Willmot and Nix breached any such duties. Neither the complaint nor the supplementary Hensley affidavit identify the date or amount of any payment supposedly made by defendants to Willmot and Nix, or any actual statement made by Nix or Willmot to Sanders to induce Sanders to leave Miller. (See Peacock v Herald Sq. Loft Corp., 67 AD3d 442, 443 [1st Dept 2009].) Accordingly, plaintiffs fail to plead an “independent tort” sufficient to establish wrongful means.
Finally, as plaintiffs concede, their assertion that defendants breached the National Basketball Players Association Regulations Governing Player Agents (the Regulations) fails to state an independent tort. (See plaintiffs’ revised opp brief at 9.) Accordingly, since violation of such league regulations likewise does not constitute a crime, plaintiffs’ allegations regarding the Regulations fail to plead “wrongful means” for the purpose of a tortious interference claim. (See Carvel Corp., 3 NY3d at 190 [“as a general rule, the defendant’s conduct must amount to a crime or an independent tort”].)
3. Unjust Enrichment
Plaintiffs base their unjust enrichment claim on services they rendered to Sanders in helping him develop as a player, as well as receive an extension contract, and the failure of defendants to compensate plaintiffs for that work. Plaintiffs contend that defendants were unjustly enriched, through compensation received as a result of negotiating Sanders’ $44 million contract extension, at plaintiffs’ expense.
“ ‘The theory of unjust enrichment lies as a quasi-contract claim’ and contemplates ‘an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties.’ ” (Georgia Malone & Co., Inc. v Rieder, 19 NY3d 511, 516 [2012], quoting IDT Corp. v Morgan Stanley Dean Witter & Co., 12 NY3d 132, 142 [2009].) To state an unjust enrichment claim, plaintiffs must allege “that (1) the other party was enriched, (2) at that party’s expense, and (3) that it is *425 against equity and good conscience to permit [the other party] to retain what is sought to be recovered.” (Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 182 [2011] [internal quotation marks omitted].) In addition, while plaintiffs need not allege privity or a business relationship with the defendants, “the pleadings must ‘assert a connection between the parties that [is] not too attenuated.’ ” (Philips Intl. Invs., LLC v Pektor, 117 AD3d 1, 3 [1st Dept 2014], quoting Georgia Malone & Co., Inc., 19 NY3d at 517.) The connection between the parties must be such that it “could have caused reliance or inducement.” (NY PJI 4:2, Comment, citing Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 182 [2011].)
Here, plaintiffs allege no relationship with defendants, let alone a relationship sufficient to cause reliance or inducement. Plaintiffs assert that defendants are rival sports management firms. While plaintiffs contend that it is enough that defendants were aware of plaintiffs’ relationship with Sanders, the First Department has affirmed that “awareness,” without more, does not establish the relationship necessary to state an unjust enrichment claim. (Georgia Malone & Co., Inc., 19 NY3d at 517.) In Georgia Malone, the First Department noted that it dismissed an unjust enrichment claim in Mandarin Trading due to “the lack of allegations [in the complaint] that would indicate a relationship between the parties, or at least an awareness by [the defendant] of [the plaintiffs] existence.” (Id., quoting Mandarin Trading Ltd., 16 NY3d at 182.) However, the Georgia Malone court rejected the notion that the mere pleading of a defendant’s “awareness” of plaintiff’s existence or plaintiff’s activities would be enough to set forth a sufficient relationship for purpose of an unjust enrichment claim. (Id. [“Seizing on Mandarin’s reference to ‘awareness,’ Malone argues that its unjust enrichment claim should be allowed to proceed because Rosewood was aware that Malone had created the due diligence reports and Rosewood had used the materials for its own benefit without compensating Malone. But mere knowledge that another entity created the documents is insufficient to support a claim for unjust enrichment under the facts of this case”].) Instead, the First Department explained that it used the term “awareness” in Mandarin Trading, not to create a new manner in which to plead a sufficient relationship between the parties, but instead “to underscore the complete lack of a relationship between the parties in that case.” (Id.)
Plaintiffs concede that they have no direct relationship with defendants and that the parties are instead “business competi *426 tors.” (See plaintiffs’ revised opp brief at 13.) Nonetheless, plaintiffs assert that “Defendants were aware of Plaintiffs’ relationship with Sanders”; however, as explained by the First Department such pleading of awareness, in and of itself, does not give rise to an unjust enrichment claim. Thus, based on the facts pleaded here, the relationship between plaintiffs and defendants “is too attenuated because they simply had no dealings with each other.” (Georgia Malone & Co., Inc., 19 NY3d at 517-518.) Accordingly, plaintiffs fail to state a claim for unjust enrichment.
Moreover, plaintiffs have not alleged that they undertook any actions for defendants’ benefit.
“While ‘[a] cause of action for unjust enrichment is stated where plaintiffs have properly asserted that a benefit was bestowed ... by plaintiffs and that defendants will obtain such benefit without adequately compensating plaintiffs therefor’, it must also be pleaded and proven that the benefit conferring services were performed for the defendant, thereby resulting in defendant’s unjust enrichment.” (Murphy v 317-319 Second Realty LLC, 95 AD3d 443, 446 [1st Dept 2012] [emphasis added and citations omitted].)
Since plaintiffs have not made any such pleading, their unjust enrichment claim likewise fails on this basis.
4. Unfair Competition
Plaintiffs’ claim for unfair competition is rooted in the allegation that defendants have misappropriated plaintiffs’ labor, skill, and expenditures. Plaintiffs allege that they expended time and effort for IV2 years in order to secure a lucrative second contract for Sanders and that, at the last minute, defendants committed wrongful acts by which they misappropriated the fruits of plaintiffs’ efforts.
A claim of unfair competition requires more than a showing of “commercial unfairness.” (See Ruder & Finn v Seaboard Sur. Co., 52 NY2d 663, 671 [1981].) New York law has long, recognized two theories of common-law unfair competition: “palming off,” which is not at issue here, and misappropriation. (ITC Ltd. v Punchgini, Inc., 9 NY3d 467, 476 [2007].) “An unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiffs property to compete against the plaintiffs own use of the same property.” (Id. at 478.) “To state such a claim, a plaintiff must demonstrate that it had *427 compiled information used in its business that provided an opportunity to obtain a competitive advantage and that a competitor misappropriated it.” (Edelman v Starwood Capital Group, LLC, 2008 NY Slip Op 31882[U], *5-6 [Sup Ct, NY County, June 27, 2008], affd 70 AD3d 246 [1st Dept 2009].)
Plaintiffs here do not allege that they compiled information and that such information was taken by defendants for their own use. Instead, plaintiffs’ claim distills down to a claim for ownership, at least in part, of Sanders’ accomplishments in his second and third seasons in the NBA. Plaintiffs contend that their efforts are reflected in Sanders’ achievements and that defendants “took” Sanders so to benefit financially from those achievements. Such a claim is far afield from a proper misappropriation claim, since plaintiffs of course do not contend Sanders was their “property” and they assert no factual basis from which to determine that plaintiffs worked with Sanders so to gain a “competitive advantage” in their industry. Accordingly, plaintiffs’ unfair competition claim is dismissed for failure to state a claim.
5. Prima Facie Tort
Plaintiffs’ final claim is for prima facie tort. “The requisite elements of a cause of action for prima facie tort are (1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful.” (Freihofer v Hearst Corp., 65 NY2d 135, 142-143 [1985].) Further, “there is no recovery in prima facie tort unless malevolence is the sole motive for defendant’s otherwise lawful act or . . . unless defendant acts from disinterested malevolence.” (Burns Jackson Miller Summit & Spitzer v Lindner, 59 NY2d 314, 333 [1983] [internal quotation marks omitted].)
Plaintiffs “admit that they cannot show, as required under New York law, that Defendants’ actions resulted solely from disinterested malevolence.” (Plaintiffs’ revised opp brief at 17.) Instead, plaintiffs contend that they state a claim under California law, notwithstanding the fact that they raised no basis upon which the court could apply California law. Having raised no conflict between New York and California law, the law of the forum applies (see n 3, supra), and under New York law, plaintiffs concede that they have no claim. Accordingly, defendants’ motion to dismiss plaintiffs’ prima facie tort claim is granted.
*428 III. Conclusion
For the foregoing reasons, defendants’ motion to dismiss plaintiffs’ complaint is granted for failure to state a cause of action. The remainder of defendants’ motion, including their request to dismiss the complaint on forum non conveniens grounds and to strike certain allegations from the complaint, is denied as moot.
For the foregoing reasons, it is ordered that defendants Relativity Sports, LLC, Relativity Media, LLC, Rogue Sports, LLC, Happy Walters, and Dan Fegan’s motion to dismiss is granted pursuant to CPLR 3211 (a) (7) and is otherwise denied as moot.

. While originally named as defendants in the action and still appearing in the caption, the claims asserted against Cree Nix and Seth Willmot have been dismissed without prejudice pursuant to the parties’ February 24, 2014 stipulation of partial dismissal without prejudice (docket No. 16). Accordingly, the court’s use of “defendants” in this decision will refer only to the remaining defendants in the action.

. The facts cited in this section are drawn from the complaint, unless otherwise noted.

. In their briefing, the parties cite to and discuss New York law almost exclusively. As an aside, the parties note California case law and appear to present it as an alternative basis to dismiss or sustain the four claims at issue on this motion. To raise a choice of law issue, the burden is on the party asserting the conflict, if any, to assert that a conflict actually exists. (See e.g. Portanova v Trump Taj Mahal Assoc., 270 AD2d 757, 759-760 [3d Dept 2000] [“(P)laintiffs have failed to establish the existence of any conflict between the legal principles stated herein and the applicable law of New Jersey ... As a consequence, we need not engage in any choice of law analysis”].) However, the parties do not argue that New York law is in conflict with California law. Accordingly, the parties have not raised a choice of law issue, and the court will apply New York law as the law of the forum. (See SNS Bank v Citibank, 7 AD3d 352, 354 [1st Dept 2004] [“The first step in any choice-of-law analysis is to determine if there is actually a conflict between the laws of the competing jurisdictions. If there is none, then the law of the forum state where the action is being tried should apply” (citation omitted)].)